THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. MARK CHRISTOMOS, Defendant-Appellee.

Second District   No. 2—87—0384

Opinion filed July 21, 1988.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Virginia M. Ashley, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Jed H. Stone and Susan Valentine, both of Jed Stone, Ltd., of Waukegan, for appellee.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

The State, which filed a certificate of impairment, appeals from an order of the circuit court of Lake County that suppressed defendant's statements and quashed his arrest for his wife's murder. On appeal, the State contends that the defendant, Mark Christomos, was not in custody when he requested a lawyer and his statements were voluntary in nature. We affirm.

The following pertinent facts were adduced at the suppression hearings. Sergeant Holderbaum testified for the State that the North Chicago police department dispatched him to investigate a personal injury accident near the Ron Ric Motel in the early morning of October 26, 1986. Holderbaum observed defendant walking through a parking lot with his head bleeding. According to Holderbaum, he stopped defendant and offered to assist him. Holderbaum questioned defendant regarding the cause of his injuries and learned that defendant had fought with his wife. Defendant indicated that his wife was hurt.

Holderbaum and defendant found defendant's wife, the victim, in the driveway of the motel bleeding from her ear with blood under her head. Defendant held his wife and stated that he and his wife were jumped by two men. Holderbaum telephoned a rescue squad and technician. When the paramedics arrived, defendant became very upset and interfered with the paramedics until the police restrained him.

Officer Newby, who later arrived at the scene, transported defendant handcuffed in a police car to a hospital for treatment of his nose. Meanwhile, his wife was in critical condition in another hospital. Newby testified that, because defendant was upset to the point of being unruly, Newby handcuffed defendant. Newby considered defendant a victim of a crime, not a suspect, and therefore did not arrest defendant.

Once at the hospital, Newby uncuffed defendant, but defendant remained unruly, screamed about his wife, and asked, "[W]here's my lawyer?" Dr. O'Leary testified that the defendant repeatedly screamed questions regarding his wife's condition. Defendant was intoxicated and suffered from a nasal fracture and lacerations. Dr. O'Leary also heard defendant yelling from a back room of the hospital, while he was awaiting treatment, that he wanted a lawyer, his rights, and the opportunity to use the telephone.

According to Dr. O'Leary, when defendant became overly disruptive, he ordered defendant to be restrained in a gurney. The police did not question defendant while he was restrained. However, a police officer requested permission to wait at the hospital until defendant was medically cleared in order to obtain a statement.

Newby testified that after defendant received medical attention, defendant calmed down and requested information on his wife's condition. Newby told defendant that he would have to go to the police station where the authorities would be able to answer his questions. Newby, however, admitted at the hearing that another officer may have told him to bring defendant to the station for questions. Newby denied transporting defendant to the station in handcuffs. The parties entered a stipulation which revealed that Detective Fermaint spoke with Newby while at the hospital and instructed him to bring defendant to the police station for a statement. Fermaint considered defendant a murder suspect and wanted to talk to him.

Defendant's father, Nicholas Christomos, testified for the defense that he received two telephone calls from defendant in the early morning of October 26, 1986. Defendant's father initially learned that two men attacked defendant and his wife and that the wife was hospitalized in critical condition. Defendant indicated on the telephone that he was at the police station, and the police wanted him to issue a statement before they would allow him to visit his wife. Defendant was slurring his words and incoherent.

Approximately 15 minutes later, defendant telephoned his father a second time indicating that he wanted to be with his wife, but he could not go to the hospital because the police wanted a statement. Defendant's father asked him if the police had arrested him. Defendant asked police if he was under arrest, and the officers responded that he was not under arrest. Defendant's father advised defendant to secure a lawyer.

While defendant was being treated and then transported to the police station, Detective McKissick and Officer Thivierge went to the Anchor Lounge to investigate. After interviewing the workers, McKissick went to the hospital and told Dr. O'Leary that he wanted a statement as soon as possible from the defendant because he was a possible victim of a mugging.

Once at the police station, McKissick indicated that at 5:17 a.m., defendant, McKissick, and Officer Phelps were seated at a table in the middle of a 6- by 9-foot room. After the officers read defendant his rights, defendant claimed that his rights had been violated since the police had not permitted him to use the telephone. The police al-

lowed defendant to call three people while they remained in his presence.

Later, at 5:45 a.m., the police read defendant his *Miranda* rights. According to McKissick, defendant indicated that he understood his rights and, after initially refusing, eventually signed a waiver of rights. In response to Detective Phelps' questions, defendant indicated that he and his wife decided to go drinking at the Anchor Lounge. He told the bartender to run a tab with a $30 limit. He and his wife had been drinking when his wife began arguing with a male patron of the bar resulting in defendant, his wife, and the patron wrestling on the floor. Because of the fight, the employees of the bar asked them to leave.

Defendant and his wife walked to another tavern, the Circus Pub. When defendant refused to buy his wife a drink, she solicited a drink from a male patron of the bar. Defendant urged his wife to leave the bar, but when she refused and struck him across the nose with a beer bottle, he pushed her outside the bar in an attempt to get her to return to the Ron Ric Motel, approximately five blocks west of the Circus Pub. Defendant resorted to dragging and carrying his wife, yet she resisted. When they eventually arrived at the motel, defendant managed to open the screen door of the room, but his wife ran away. He caught up with her, and they began a shoving match. She slapped him, and he returned the slap, causing her to fall. He fell on top of her, and they began to wrestle. Eventually, he grabbed his struggling wife by the hair and hit her head against the pavement a couple times. He noticed that he had blood on his hands. He left her to seek help, and, while walking toward the street, he flagged a police car.

Defendant also explained that his wife fractured his nose and scratched him during the quarrel. Defendant admitted fabricating the mugging account. McKissick's and Phelps' testimony regarding defendant's statement was consistent.

Defendant, after giving this statement, agreed to repeat his confession on tape. Phelps had urged the defendant to tape the statement in order to capture his emotions. The transcript of the tape revealed that, at one point, Detective Phelps began reading the rights to the defendant and asking the defendant to agree if he understood them. The following ensued:

> "PHELPS: Are you ready and willing to answer questions or to make a statement without first consulting with a lawyer or without having a lawyer present during questioning.
> DEFENDANT: I really do, I do want my lawyer present.
> PHELPS: You want your lawyer present?

DEFENDANT: Yes, I do.

PHELPS: Well if you want your lawyer present I'm going to have to stop talking to you. Is that what you want?

DEFENDANT: I'll talk to you but I just feel I should have my lawyer present but if you say it's all right it's all right.

PHELPS: What I'm telling you is that if you are requesting a lawyer, o.k., I'm going to have to stop talking to you. Are you requesting to have your lawyer here while you give us a statement?

DEFENDANT: I do resort [*sic*] involve, if I do what does that involve?

PHELPS: It doesn't involve anything, but you contacting your lawyer. You have that right, o.k.?

DEFENDANT: Yeah I understand that.

PHELPS: What I'm asking you to do is do you want your lawyer here while you're giving us a statement or are you willing to go ahead and give us a statement which you have previously done.

DEFENDANT: You know if I give a statement that's saying what?

PHELPS: You have already given us a statement o.k.? What we ask is that you would be willing to give us a taped statement to give us, to put it in your own words on tape. You agreed to do that.

DEFENDANT: Yes I did.

PHELPS: Before, o.k.? Now that you're telling me that I don't know what you're telling me really. Would you like to go ahead and put this statement on tape without your lawyer being present, or would you like to contact an attorney and talk to him? That's what I'm not clear on.

DEFENDANT: I'll give you a statement and tell you what happened."

At 5:45 a.m., after completing the tape, the police told defendant he was under arrest. However, a booking statement indicated that police arrested defendant at 5:17 a.m.

Defendant testified at the hearing as follows. When the paramedics treated his wife, police had to restrain him because he was interfering. Police brought him to a hospital for treatment where Dr. O'Leary restrained him in a gurney because he was disruptive. All the while, he screamed that he wanted an attorney. The police were present every time he turned his head. His wallet and belongings were taken. When he was finally released from the hospital, he

wanted to see his wife, but Officer Newby told him that he had to answer questions first at the police station. Defendant, contrary to Newby's account, indicated that he was handcuffed in the squad car en route to the station. Defendant told police that he wanted to see his wife, but police indicated that he would not be allowed to see his wife until he returned from the police station. Defendant claimed he told the police, "I want to be with my wife and I want a lawyer." Allegedly, police stated they would "see about getting one later." Also, the police stated they would have to read him his rights first. Defendant again requested a lawyer and told police he could not understand the acknowledgment and waiver of rights. Nevertheless, he gave a statement and spoke on tape.

The trial judge found Dr. O'Leary's and defendant's testimony regarding defendant's request for a lawyer credible. Further, the court determined that defendant was in custody at the time he requested a lawyer, yet the police failed scrupulously to honor his request. Defendant was extremely agitated, and he wanted to be with his wife. He had no privacy when he made the telephone calls, and he could not be with his dying wife unless he gave a statement. As a consequence, the court determined that the statements were inadmissible because police coerced defendant to confess, rendering the statements involuntary. The court also found that defendant's request for counsel was unequivocal.

■ The State argues on appeal that defendant was not in custody when he made the request for counsel; therefore, his confession would be admissible. The trial court's ruling following a hearing on a motion to suppress will be disturbed by a reviewing court only if it is against the manifest weight of the evidence. (*People v. Ellison* (1984), 126 Ill. App. 3d 985, 992, 466 N.E.2d 1024, 1028.) In this case, we are persuaded that the trial court's ruling that defendant was in custody at the time he requested a lawyer should not be disturbed.

■ In determining whether a statement was made in a custodial setting, a court must look to all the circumstances surrounding the questioning, with no single factor deemed controlling, and then objectively evaluate whether a reasonable, innocent person would have believed that he was free to leave or was expressly or impliedly bound to remain in the presence of the police. (*People v. Finklea* (1983), 119 Ill. App. 3d 448, 451-52, 456 N.E.2d 680, 682.) Numerous factors are to be considered in the inquiry: the location, time, length, mood and motive of the interrogation; the number of police officers present and the presence or absence of friends or family of the accused; any indicia of formal arrest of the subject, including physical restraint, show

of weapons or force, booking, fingerprinting or informing the person he is under arrest; the manner in which the person questioned got to the place of interrogation, *i.e.*, voluntarily on his own, in response to a police request, or on a verbal command indicating compulsion; whether he voluntarily assists police in their interrogation; whether the subject is allowed to walk within the location of the interrogation unaccompanied by police; and the age, intelligence, and mental makeup of the accused. *People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028, 435 N.E.2d 226, 230.

■ In this case, the court believed the defendant's testimony that the officer handcuffed him and drove him in a squad car to the police station. Defendant also testified that on numerous occasions he had requested to be with his wife at the hospital but was told that first he had to give a statement to the police regarding the incident. The State claimed that the police interrogated defendant as a victim of a crime rather than as a suspect. However, this testimony was contradicted by Newby's account that perhaps another officer told him to bring defendant to the police station because they considered him a suspect. Additionally, a stipulation revealed that Detective Fermaint requested Newby to bring defendant to the station because he considered defendant a suspect of the crime.

Moreover, the police had possession of defendant's wallet. Initially, police did not allow defendant to use the telephone until he insisted and accused the police of violating his rights. Once allowed to call, police told him "his time was up," and his phone calls were always in the presence of the police. In a 6- by 9-foot room, two police officers attempted to elicit a statement from defendant by refusing his requests to see his wife, who eventually died from the injuries, until he made a statement. Defendant's father corroborated that defendant wanted to see his wife but was being prevented from doing so until he gave a statement to the police. Therefore, the defendant reasonably believed that he was not free to leave and be with his wife, and, in light of these circumstances, we cannot overturn the trial court's ruling that the defendant was in custody at the time he requested a lawyer.

■ Further, a second issue at the suppression hearing was whether defendant had waived his rights after receiving *Miranda* warnings. Whether a valid waiver has been given depends on whether the accused in fact knowingly and voluntarily waived those rights. (*People v. Racanelli* (1985), 132 Ill. App. 3d 124, 132, 476 N.E.2d 1179, 1184.) To determine whether a waiver is knowing and intelligent, the facts and circumstances of each case must be considered as

well as those characteristics of the accused which bear upon his ability to make a knowledgeable and intelligent decision. *Racanelli*, 132 Ill. App. 3d at 132, 476 N.E.2d at 1184.

■■ ■ The burden is on the State at a suppression hearing to show by a preponderance of the evidence that defendant's confession was voluntarily given. Likewise, the State must show by a preponderance of the evidence that the defendant voluntarily and knowingly waived his *Miranda* rights. (*People v. Nau* (1988), 167 Ill. App. 3d 338, 349, 521 N.E.2d 177, 185.) The court reasonably found that defendant's statements were coerced given that the testimony indicated that a statement was a prerequisite to his seeing his critically injured wife. Defendant testified that he was told he had to give a statement before visiting his wife. Defendant's father testified to telephone conversations where defendant indicated he had to give statements in order to see his wife. A stipulation revealed that defendant was a suspect, and although no probable cause existed to arrest him, police took him to the station after doctors medically released him. The trier of fact found defendant's testimony credible. This credibility determination must be given deference on appeal. Where the evidence is merely conflicting, a court of review will not substitute its judgment for that of the trier of fact. *Racanelli*, 132 Ill. App. 3d at 129, 476 N.E.2d at 1182.

■■ Moreover, the trial court found that because the police continued to interrogate the defendant after he unequivocally invoked his right to counsel, the statement should be excluded. We find support for the trial court's determination in *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490, where the interrogation was similar to the one in the case at bar. In *Smith*, the defendant was arrested and interrogated. The police began to advise him of his *Miranda* rights, and defendant stated in response to having a lawyer present, "Uh, yeah. I like to do that." However, police continued to question him and advise him of his right to a lawyer:

"Q. Do you wish to talk to me at this time without a lawyer being present?

A. *Yeah and no, uh, I don't know what's what, really.*

Q. Well. You either have [*to agree*] to talk to me this time without a lawyer being present and if you do agree to talk with me without a lawyer being present you can stop at any time you want to.

A. All right. I'll talk to you then." (Emphasis in original.) (*Smith*, 469 U.S. at 93, 83 L. Ed. 2d at 492, 105 S. Ct. at 491.)

Defendant ultimately confessed before again requesting a lawyer,

which request the police honored. Although the Illinois Supreme Court found the statements ambiguous, the United States Supreme Court reversed. The court noted that in *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, it had intended to establish a clear requirement that all questioning should cease once a defendant had requested counsel. See *Arizona v. Roberson* (1988), 486 U.S. ___, 100 L. Ed. 2d 704, 108 S. Ct. 2093.

In this case, even before defendant was in custody, police knew that defendant wanted a lawyer. Defendant requested one at the hospital and at the police station. Officers also overheard defendant's father telling defendant to get a lawyer before making any statements. Nevertheless, in their pursuit to obtain a statement, police did not scrupulously honor defendant's right to counsel. Therefore, the trial court properly excluded the statements.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

WOODWARD and UNVERZAGT, JJ., concur.