THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
ERIC SPIVEY, Defendant-Appellee.

First District (1st Division)   No. 1—89—0302

Opinion filed February 4, 1991.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Gael M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier and James Chadd, both of State Appellate Defender's Office, of Chicago, for appellee.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

The sole issue presented on appeal is whether the trial court's ruling which granted defendant's motion to suppress on the ground that the State violated his constitutional rights when the police held him to *incommunicado* interrogation, even though defendant and his mother had previously requested that he remain silent and the presence of an attorney, is manifestly erroneous. Defendant, Eric Spivey, a 17-year-old boy, was charged, along with Brian Duffy, with the rape and murder of a 14-year-old girl. The relevant facts are adduced from the testimony of witnesses given during the hearings on the motion to quash arrest and motion to suppress.

During the hearing on the motion to quash arrest, Detectives Glynn and Mokry of the Chicago police department testified that they were assigned to investigate the rape and murder of the girl. On June 24, 1986, they took two separate statements from Bryant, a witness who had information about the persons involved in the murder of the girl, and the "vigilante" attack on Duffy, who had been severely beaten the day after the murder and died a month later. Bryant told the detectives that on the night of the murder, at about 10 p.m., he, Duffy and defendant met at a liquor store and later went to a park where they observed the girl walking through the park in an eastbound direction towards her home. The boys followed the girl and attempted to "hit on her" and "ask for sex." However, she began to run, and Duffy and defendant chased her, dragged her to a bushy area, "crawled on top of her" and "went up and down" on her. When they left, the girl was motionless and quiet. The girl's body was found the next day in a prairie near bushes and trees on an abandoned railroad property.

On June 25, the detectives proceeded to Little Company of Mary Hospital to interview the defendant, who was being treated for injuries sustained the night before when he jumped from a second-floor window to avoid a threatened vigilante attack. However, after being told by defendant's mother, Mrs. Thomas, that her son did not wish to be interviewed, the men left the room. Shortly thereafter, defendant

was released from the hospital, and as he attempted to get in his car, he was arrested and transported to the police station. Assistant State's Attorney Zelazo's testimony corroborated that of the detectives.

Defendant's stepfather, Mr. Pulliam, testified that he and defendant's mother arrived at the hospital on the morning of June 25 and saw four white men who identified themselves as Chicago police officers and the assistant State's Attorney standing outside defendant's room. The four men later entered the hospital room and approached defendant's bedside, at which time one of the men attempted to talk with defendant. Even though Mrs. Thomas told the man not to talk to defendant, he continued to question him for approximately 10 to 15 minutes. However, every time the man asked defendant a question, defendant replied that he did not want to talk to him. Next, one of the men requested that Mrs. Thomas come outside the room, which she did. The two remained outside the room with the door closed for a few minutes. When they returned, the men paused for a moment and left.

Subsequently, defendant was released from the hospital, and as he was getting out of the wheelchair at the entrance of the hospital to enter the car, he was met by the detectives, who placed him under arrest and into a squad car. Following defendant's arrest, Mr. Pulliam and Mrs. Thomas went to the police station. Mrs. Thomas repeatedly asked the desk officer if she could speak with her son; however, she was told that he was not at the station, even after Officer Hutchins, a long-time friend of Pulliam's, told them the boy was upstairs.

The circuit court ruled that based upon Bryant's statements, which were corroborated, the police had probable cause to arrest defendant and denied the motion to quash arrest.

When the court reconvened on the motion to suppress, the parties requested that the court take notice of and adopt the testimony received during the motion to quash arrest for purposes of the hearing. Detectives Mokry and Glynn reiterated that they did not question defendant at the hospital, that he neither told them that he wanted an attorney at the hospital, during the ride in the squad car, nor at the police station. The detectives testified that none of the officers had any conversations with the defendant until the assistant State's Attorney entered the interview room around 1 p.m., at which time defendant was given his *Miranda* rights, acknowledged that he understood them and waived those rights as he proceeded to talk to the police and assistant State's Attorney for about an hour about the girl's murder.

The assistant State's Attorney's testimony was essentially the same as the officers'. He stated that while he was speaking with defendant, Detective Glynn was paged, left the room and returned with attorney Bourgeois, Sr., at which time the interview was terminated. Zelazo also stated that defendant did not sign a written waiver of his rights as both arms were in casts, and he had not completed the paperwork prior to the attorney's arrival.

Officer Hutchins stated that he saw Mr. Pulliam at the station who told him that his son was upstairs and that he wanted to speak to him. Upon inquiry, Hutchins was told by the officers upstairs that they were questioning some "young men" and that "they would let the young man speak with whoever was downstairs when they were finished." The officers involved in the interrogation, however, denied ever knowing that defendant's mother was in the station during this time.

Mrs. Thomas testified that, while at the hospital, she and the defendant repeatedly told the police that defendant was not going to answer any questions without the presence of his lawyer. She stated that, during defendant's arrest, the police denied her permission to accompany him in the squad car but told her to go to the Area Two station. However, before anyone left, both she and the defendant again told the police that he was "not going to answer any questions until he [had] a lawyer."

The defendant testified in his own behalf that, when the men attempted to question him at the hospital, he and his mother told them that he did not want to be questioned. He also stated that "[t]hey just kept on trying to question me. I just kept quiet. *** She [his mother] told them not to question me either." Defendant testified that, following the arrest, he was held in an interrogation room for hours where officers kept coming into the room, looking at him and saying: "You know you done it." They also brought in Bryant, along with three or four other officers, for a few seconds. Then, everyone left the room except for one officer who asked defendant, "Did you ever tell them that you done it[?]" Defendant testified that he responded "No. *** I told him I wanted to see a lawyer, I wanted to go home." Afterwards, he was threatened by one "short, fat" officer and given "two options," either to "make a statement and go home" or be taken "in the corner and jumped on." Defendant then commenced to give a statement to the assistant State's Attorney. In addition, attorney Bourgeois, Sr., testified that as he was the lawyer representing defendant, he called Area Two twice, identified himself and inquired if

defendant was there, and was told on both occasions that defendant was not there.

Following the hearing, the trial court issued a memorandum opinion and order which made detailed findings of fact. In particular, the court found that defendant had invoked his rights to remain silent and to have an attorney present before the arrest, and that the giving of *Miranda* warnings after the arrest was ineffective to overcome the prior invocation of defendant's rights or the coercive environment of his *incommunicado* incarceration. The court suppressed the statements, and the State now appeals pursuant to Supreme Court Rule 301 (134 Ill. 2d R. 301).

The State first contends that the trial court's characterization of defendant's prearrest statements and those of his mother, as an invocation of *Miranda* rights to be imputed post-arrest, is manifestly erroneous. The State urges that the prearrest invocation of rights, if in fact there was such an invocation, had no effect once defendant was arrested, given the *Miranda* warnings, acknowledged that he understood each right, and then waived both his right to remain silent and his right to an attorney. Next, the State maintains that the trial court erred in ruling that because the officers held defendant *"incommunicado,"* he did not knowingly and voluntarily waive his *Miranda* rights. The State argues that a review of the "totality of the circumstances," which is the test to determine the voluntariness of any confession (*People v. Prude* (1977), 66 Ill. 2d 470, 475, 363 N.E.2d 371), requires the conclusion that defendant knowingly and intelligently waived his *Miranda* rights where the evidence reveals: (1) that defendant was neither in pain, denied medication nor mistreated; (2) that defendant was of a mature age (17½ years old); (3) nothing to suggest that defendant has less than normal intelligence; (4) that defendant was not questioned prior to making a statement to the assistant State's Attorney; (5) defendant was only questioned once; and (6) that defendant was not held in custody for long periods of time.

Conversely, defendant, in asserting that the trial court's ruling was proper, focuses on the State's actions as a constitutional deprivation of his rights to remain silent and to have an attorney present. Specifically, defendant urges that although he was neither under arrest nor in police custody at the hospital when he invoked his constitutional rights, his clear and unambiguous request for an attorney at that time applied to the arrest which immediately followed, and further, should have precluded the police from ignoring his request for an attorney by subjecting him to *incommunicado* interrogation. He relies on *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378,

101 S. Ct. 1880, in support of his contention that the "assertion of the right to counsel is a significant event" which triggers procedural safeguards and *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093, as an example of a situation where a defendant's request for counsel applied to a case for which he had not been arrested. Finally, defendant argues that the use of *incommunicado* interrogation by the officers was designed to produce an involuntary waiver of defendant's *Miranda* rights and an involuntary statement.

■■■ We agree with defendant's argument on appeal that the State's actions in the case at bar constituted an egregious violation of defendant's constitutional rights and, therefore, preclude any finding that the trial court's ruling was manifestly erroneous in granting defendant's motion to suppress illegally obtained statements. The fifth amendment of the United States Constitution provides, in relevant part, that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." (U.S. Const., amend. V.) Moreover, *Miranda* and its progeny provide that an accused, subjected to custodial interrogation, is entitled to admonition of his fifth amendment rights prior to the commencement of any questioning. (See *Miranda. v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; see also *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880; *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093.) If a suspect asserts his right to remain silent, but subsequently waives such right, the waiver will be deemed effective if knowing, intelligent, and voluntary. (*Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321.) To the contrary, however, where a suspect asserts his right to counsel during interrogation, any subsequent waiver of the right to counsel will be deemed involuntary, as a matter of law. (*Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) *Edwards* established the rule that a suspect subjected to custodial interrogation who has requested the presence of counsel before answering any questions is not subject to further interrogation until counsel had been made available to him, unless he initiates further communication, exchanges or conversations with the police. More recently, in *Minnick v. Mississippi* (1990), 498 U.S. ___, 112 L. Ed. 2d 489, 111 S. Ct. 486, the Court held that when counsel is requested, interrogation must cease, and officials must not reinitiate interrogation without counsel present, whether or not the suspect has consulted with his attorney. *Minnick* reemphasizes the *Miranda* and *Edwards* purpose that the requirement that counsel "be made available" encompasses the right of the accused to have

counsel present during custodial interrogation, as well as the right to consult with counsel outside the interrogation room.

■ Here, the State urges that there was no invocation of *Miranda* rights, or alternatively, assuming a finding that there was an invocation, it did not cover the situation after defendant's arrest. Essentially, the State argues that assuming defendant requested to remain silent and the presence of counsel while in the hospital, but prior to his arrest or any custodial interrogation, such requests were insufficient to trigger *Miranda* rights. We disagree. As stated by this court in *People v. Young* (1990), 201 Ill. App. 3d 521, 558 N.E.2d 1287, "[a]n individual's fifth amendment rights exist exclusive of the right to receive *Miranda* warnings. Therefore, we do not view custodial interrogation as an indispensable requisite for the invocation of those rights." (*Young*, 201 Ill. App. 3d at 525.) Additionally, *Edwards* and *Roberson* establish that the right to have counsel present during interrogation is so important and fundamental that the invocation of such a right should not depend on whether or not an arrest had taken place.

■ Similar to the *Christomos* decision (*People v. Christomos* (1988), 172 Ill. App. 3d 585, 527 N.E.2d 41), also discussed in *Young*, the record below supports the trial court's finding that defendant here had unequivocally invoked his fifth amendment rights at the time the detectives visited him in the hospital even before he was taken into custody. In *Christomos*, the defendant and his wife, who were involved in a personal injury accident, were taken to the hospital. The police believed the couple had been victims of a mugging and did not suspect them of any crime; however, because of the defendant's unruly behavior, he was handcuffed. At that time, defendant requested an attorney. When he was later placed in custody, he again requested counsel. The court found that although the police were aware of defendant's precustody request for counsel, they failed to honor his fifth amendment right to counsel when they initiated interrogation.

In the case at bar, a portion of the record reflects that the police and the assistant State's Attorney came to the hospital while defendant lay in a bed with both arms incapacitated as a result of injuries sustained during a threatened vigilante attack. They were not allowed in the hospital room until the arrival of defendant's mother and stepfather, who were notified by one of the nurses at the hospital that the police were there to question the boy. Once the police entered the room, they were repeatedly informed by Mrs. Thomas and the defendant that he did not want to answer any questions and that he wanted an attorney. Although defendant was not under arrest at this time or

in custodial interrogation, within the technical meaning of the term, he nevertheless invoked his fifth amendment constitutional rights to remain silent and to counsel. We agree with *Young* that a defendant may invoke his fifth amendment rights prior to the initiation of custodial interrogation. Moreover, we conclude that once such invocation is unequivocally made, it is improper and a clear violation of the defendant's fifth amendment constitutional rights for the police to initiate interrogation. (See generally *Minnick v. Mississippi* (1990), 498 U.S. ___, 112 L. Ed. 2d 489, 111 S. Ct. 486.) *Miranda* provides that if the defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612.

However, here the State denies the unequivocal invocation of defendant's fifth amendment rights either before or during custodial interrogation. Although the record demonstrates conflicting evidence as to this matter in that the detectives and assistant State's Attorney testified that defendant never requested an attorney while defense witnesses testified to the contrary, the State's argument that defendant failed to inform the police that he wanted counsel present before any questioning is flawed. As the trial court stated in its opinion:

> "First, in accordance with *Miranda* it is not necessary for the defendant to expressly request an attorney. *** Thus, the statement by defendant's mother in his presence and acquiesced to by defendant indicates his intention to consult with an attorney prior to questioning. Second, defendant and Mr. Pulliam both testified that while still at the hospital defendant asserted that he did not wish to speak with the police until his lawyer was present. This assertion is not specifically denied by Mokry, Glynn or Zelazo. Rather, Mokry and Glynn testified that defendant did not tell them he wanted an attorney. This appears from the record to be at the time that he was given *Miranda* warnings at the station. From the totality of the circumstances the court finds that defendant specifically invoked his right to remain silent."

■ Moreover, we believe that the conduct of the law enforcement officers following their departure from the hospital room supports the trial court's finding that the police created a coercive environment, which would likewise invalidate any statements or confession obtained from defendant therein. The trial court stated that the giving of *Miranda* warnings and the police contention of waiver do not eliminate the *incommunicado* status of the accused, and therefore, the

State's burden in showing waiver has not been met. The police inquired when the defendant would be released from the hospital, waited until that time, and as he was attempting to get into the car with his mother, they separated him from his parents, arrested him, denied his mother's request to accompany him in the squad car and took him into the station. There is no evidence that, once at the station, the detectives inquired as to his parents' whereabouts or if his attorney had arrived, or, if in fact, he had counsel. As stated in *Miranda,* here there is no indication that "the officers under[took] to afford appropriate safeguards at the outset of the interrogation to insure that the statements were truly the product of free choice." *Miranda,* 384 U.S. at 457, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.

The police testified that defendant was not given any *Miranda* warnings until the assistant State's Attorney arrived a few hours after the arrest, at which time he immediately started to talk. Yet defendant testified that he was consistently questioned, harassed and threatened during this time. The testimony of his parents established that they went immediately to the station but were denied an opportunity to speak with defendant and were told that he was not there. His attorney was unable to talk to him on the phone and was also told that he was not at the station. Thus, we find that the trial court's conclusion is proper that the police created the *incommunicado* environment because they knew defendant would not submit to interrogation while in the presence of his mother and stepfather, which was a clear violation of *Miranda.*

Additionally, the record here suggests that defendant was subjected to interrogation and that his will was overcome. He was removed from the protective shield of his mother and stepfather, and contrary to their command, and both his and his mother's requests, he was again interrogated. The record is clear that defendant answered no questions at the hospital while Mrs. Thomas and Mr. Pulliam were present. It was only when defendant was separated from his parents, threatened and told that he would not be allowed to go home that he gave a statement.

■ ■ Moreover, the record does not support the State's argument that the statements made by defendant were given after a knowing, intelligent and voluntary waiver of his rights. As stated in *Miranda,* "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel. [Citation.]" (*Miranda,* 384 U.S. at 475,

16 L. Ed. 2d at 724, 86 S. Ct. at 1628.) The State must show by a preponderance of the evidence that the defendant voluntarily and knowingly waived his *Miranda* rights. (*People v. Nau* (1988), 167 Ill. App. 3d 338, 349, 521 N.E.2d 177.) Here, the court reasonably found that the defendant's statements were coerced in that he was separated from his parents, his requests to remain silent and to have counsel present before answering any questions were ignored, and he was told that a statement was a prerequisite to his being released. Defendant testified that he was told he had to give a statement before he could go home and that if he didn't make a statement he would be "jumped on." The trier of fact found defendant's testimony and that of Mrs. Thomas and Mr. Pulliam credible. This credibility determination must be given deference on appeal. Where the evidence is merely conflicting, a court of review will not substitute its judgment for that of the trier of fact. *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 129, 476 N.E.2d 1179, 1182.

█ Accordingly, we hold that the trial court's finding that the defendant's statements were illegally obtained was not against the manifest weight of the evidence under the totality of circumstances, indicating that defendant's prearrest invocation of his fifth amendment rights to remain silent and to have an attorney present was ignored immediately following his arrest (see *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490), and that notwithstanding the *Miranda* warnings, the police created a coercive environment to obtain the statements by subjecting defendant to *incommunicado* incarceration. Such police action and conduct caused defendant's statements to be obtained in violation of his constitutional rights.

For the foregoing reasons, the judgment of the circuit court which granted defendant's motion to suppress is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.