THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EUGENE McDANIEL, Defendant-Appellant.

Second District No. 2—91—1308

Opinion filed August 20, 1993.

Andre LaBerge, of Donald Hubert & Associates, of Chicago (Donald Hubert, of counsel), for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Following a jury trial in the circuit court of Du Page County, the defendant, Eugene McDaniel, was convicted of murdering his wife and sentenced to 60 years' imprisonment. The defendant appeals, contending that: (1) the trial court erred in denying his motion to suppress statements he made to law enforcement officials prior to his arrest; (2) his public defenders denied him the effective assistance of counsel; (3) the prosecutor improperly focused the jury's attention on his failure to testify at trial; and (4) the State failed to prove his guilt beyond a reasonable doubt. We affirm.

The following evidence was adduced at trial. Officer Stacy Gangestad of the Winfield police department testified that on May 18, 1990, at 1:22 a.m., she was dispatched to the defendant's residence in order to investigate a prowler in progress. Upon arriving at the defendant's house at 1:23 a.m., she observed the defendant and two other males standing in the driveway. The defendant stated that his wife was hurt inside. Gangestad and the defendant entered the house through a door leading from the garage to the residence. They went directly to the master bedroom, where Gangestad observed the defendant's wife lying on the bed, unconscious and bleeding from the nostrils, mouth and ear. Various drawers and pieces of personal property were strewn about the room. Gangestad requested backup and she then stepped into the hallway and observed an infant in a crib in the room next to the master bedroom. Gangestad went into the baby's bedroom and saw that the baby was awake and in good condition.

Gangestad asked the defendant to exit the residence, and she and Officer Hunger, her backup, then went through each room in the house to ensure that it was safe. Gangestad observed that some of the rooms had various items strewn about, but they did not find anyone in the house. Gangestad noticed that the front door was closed and locked and that a rear sliding glass door leading to the backyard was ajar approximately six inches.

After looking through the house, Gangestad suggested to the defendant that he make some phone calls to have someone come and take care of the baby. After the defendant made three phone calls, Gangestad asked him what had happened that night. The defendant told her that after coming home from work and opening the garage door, he observed some wires hanging out of the vehicle in the garage. He also saw that the door from the garage into the residence was open and he then went across the street to awaken a neighbor to call 911.

After Gangestad and the defendant finished talking, a family friend came by to pick up the infant and an ambulance left with the defendant's wife. The defendant then left in his pickup truck to go to the hospital. Dr. Larry Blum testified that at 10 a.m. on May 18, 1990, he performed an autopsy on the defendant's wife. In his opinion, she died of a gunshot wound to the head.

Detective William Selby testified that he arrived at the defendant's house at 2:36 a.m. on May 18, 1990. Selby went into the garage, where he saw an unlocked car with its passenger doors open. Selby noticed that the keys were inserted in the ignition and that the fol-

lowing items were inside the vehicle: a cassette recorder, telephone answering machine, television, briefcase, and a bag with jewelry and coins. An AM-FM stereo receiver was on top of the hood.

Selby testified that the locks on the front door, rear sliding glass door, and interior garage door were functional and did not appear to have been jimmied, pried or manipulated. All windows in the house were closed. Some jewelry, money, a checkbook, and Wheaton police department shoulder badges were on the floor in the master bedroom. An infant's car seat, exercise bike, and pillows were in front of the sliding glass door leading to the backyard, which was open six to eight inches. Officer Jeffrey Hunger testified that he and other officers shined their flashlights across the grass in the defendant's backyard. The only footprints they saw were their own.

Detective Donald Mitchell testified that at about 4 a.m. on May 18, 1990, he and Sergeant Rizer interviewed the defendant at the hospital for about 20 minutes. The defendant told them that after arriving home and discovering the car with the doors open and wires hanging out, he ran inside and discovered his wife bleeding from the ear. He then went across the street to wake one of his neighbors so that he could call 911. The defendant later stated that he woke up his neighbors and called 911 before entering his house. The defendant also told them that his wife was happy with the marriage and the baby, and he denied having a girlfriend. –

Detective Dennis Kurzawa testified that at 4:20 a.m. he met Detective Mitchell at the hospital and then began to question the defendant. The defendant told him that he used to be a Wheaton police officer, but that he had been employed as a ramp manager with United Airlines for the last four years. The defendant said that he used to own a .38-caliber Smith & Wesson chief special handgun, but did not know where it was because his wife had given it away to a friend. The defendant stated that his wife had once pulled a gun on him and that she was "militaristically clean" and hard to live with.

The defendant told Kurzawa that on May 17, 1990, he left work around 11:15 or 11:30 p.m. Before arriving home he stopped and purchased gasoline at the Standard gas station at Geneva and Main Street in Wheaton. He described the clerk at the Standard as a 200-pound white female. However, Brad Harnesk, an employee of the Standard gas station on the corner of Main and Geneva, testified that the station closed at 11:30 p.m. during May 1990, and that no females worked for them during that month.

The defendant also said that he stopped at a 7-Eleven store in a shopping mall at County Farm and Geneva and bought a cup of cof-

fee, arriving home at 12:30 a.m. However, Virginia Thulis testified that she went to the 7-Eleven store near the corner of Geneva and County Farm Road at *1:09* a.m. on May 18, 1990. Thulis noticed a black man in dark clothing purchasing coffee. Thulis testified that she "believed" that the man she saw in the 7-Eleven store was in court. Detective Mitchell testified that on May 25, 1990, he showed Thulis a picture of the defendant, whom she identified as the man she had observed at the 7-Eleven store.

The defendant initially told Kurzawa that after arriving home and finding his wife bleeding, he ran to a neighbor's house and the neighbor called 911. However, the defendant later stated that he did not enter his house before calling 911. He could provide no explanation for why, if he arrived home at 12:30 a.m., he did not call the police until 1:21 a.m. However, the defendant denied killing his wife.

Assistant State's Attorney Joseph Birkett testified that he began to question the defendant in the hospital at 5:45 a.m. on May 18, 1990. The defendant initially denied killing his wife. However, he later told Birkett that the robbery looked staged and that he would "find the missing 45 minutes" after telling his family first. The defendant spoke with some family members, and at 11:40 a.m. he, Birkett, and Detectives Kurzawa and Mitchell drove to the defendant's house in order to get clothes for the baby. At the house, the defendant asked Birkett to come into the baby's room with him, and he closed the door. The defendant told Birkett that he would have "the whole case solved today." Birkett told the defendant that he should tell why he killed his wife. The defendant responded "I did it, I can't tell you why now, I will tell you later." Birkett then opened the door and asked Detective Panacchia to come into the room. The defendant told Birkett and Panacchia that they did not have to worry about the gun because he was going to solve the whole case today.

Detective Panacchia testified that he was working on the second floor of the defendant's house when he saw Birkett and the defendant arrive. He heard the defendant ask Birkett to come into the baby's room, and he saw the defendant close the door. A few moments later the two men exited the room, and Panacchia heard the defendant tell Birkett that he would get the gun today and "clear it up." Panacchia then asked the defendant for the location of the gun, and the defendant replied "[d]on't worry, I will get the gun today. I won't leave any stones unturned."

Detective Clyde Motter testified that at noon on May 18, 1990, he discovered a revolver under the passenger seat of the defendant's pickup truck. Detective Michael Quiroz testified that he removed the

gun from underneath the passenger seat of the defendant's vehicle. The gun was a five-shot, .38-caliber Smith & Wesson. One of the shells had been discharged. Quiroz did not recover any fingerprints from the gun.

Richard Vaughn, a forensic sergeant, was certified as an expert in the field of firearms identification. Vaughn opined that the bullet recovered from the defendant's wife could have been the same type as the bullets recovered from the gun discovered in the defendant's truck, but he could not say for sure.

James McGinley, a Wheaton police officer, testified that he and the defendant once traded guns when the defendant worked with him at the Wheaton police department. McGinley stated that the gun recovered from the defendant's vehicle looked like the weapon he had traded to the defendant. The front sight still had the orange paint McGinley had put on it in order to get a better sight picture.

Assistant Public Defender Steven Baker testified that he went to the sheriff's office at approximately 2 p.m. on May 18, 1990. Birkett asked him to talk to the defendant about the gun. Baker told the defendant that Birkett wanted to know where the gun was located. The defendant told Baker that the gun was in the pickup truck, and Baker relayed that information to Birkett. Birkett then indicated that the gun had already been found.

Darlene Williams, a customer service representative for United Airlines, testified that she first met the defendant while working at United in March of 1986, and that they became sexually intimate six to nine months later. In January 1990, the defendant told Williams that he was going to divorce his wife and marry her.

The defendant called several witnesses who testified to the defendant's good reputation for being a peaceful person.

Following closing arguments, the jury returned guilty verdicts on two counts of first-degree murder. The trial court sentenced the defendant to a term of imprisonment of 60 years. This appeal followed.

The defendant first contends that the trial court erred in denying his motion to suppress his statements made to Assistant State's Attorney Birkett and the other law enforcement officials on May 18, 1990. The defendant argues that those statements were involuntarily made while he was in custody and before he was told his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. The defendant further argues that those statements were impermissibly obtained after he invoked his right to counsel. The following evidence was adduced at the suppression hearing.

Sergeant Rizer and Detective Mitchell testified that they talked with the defendant in the meditation room at the hospital at approximately 4 a.m. on May 18, 1990. They described the meditation room as having a sofa, phone, chairs, an end table and a couple of lamps. Restroom facilities were across the hall. During the course of the conversation the defendant was not handcuffed or threatened and the door to the meditation room was not locked. The defendant did not ask for an attorney and he did not appear to be upset. After the conversation ended, the defendant left the meditation room and talked with his family.

At approximately 4:20 a.m., Detectives Mitchell and Kurzawa began a second conversation with the defendant in the meditation room. Mitchell testified that the defendant was not handcuffed or restrained in any way and the door was not locked. During this second conversation, the defendant was provided coffee and he may have been offered food. The defendant used the phone at least twice. The defendant's family was in the emergency room lobby area, which was "not too far away."

Assistant State's Attorney Birkett began speaking with the defendant in the meditation room at 5:45 a.m., just as the defendant was signing consent forms to have his home and vehicle searched. Birkett testified that the defendant was not handcuffed or restrained in any way. Birkett specifically told the defendant that he was not in custody and that he could "get up and walk out at any time." The defendant responded that he wanted to cooperate and that he would stay as long as necessary.

At approximately 6:46 a.m., the defendant called one of his co-workers. After the defendant made that phone call, Birkett told him that he was free to leave. The defendant again indicated that he wanted to stay and cooperate. The two men then discussed the time gap from when the defendant returned home to when he called the police. At approximately 7:15 a.m., the defendant called his boss at United Airlines, Jim Dougill. At 7:21 a.m., the defendant used the bathroom and spoke with his family.

After the defendant returned from the rest room, Birkett again told him that he had a right to leave. The defendant agreed to stay and said that if the roles were reversed, he would be asking the same questions. The defendant then acknowledged that it "didn't look good for him." Birkett told the defendant that even if he exercised his right to leave, a grand jury might still indict him.

Birkett then stated that there had been a change in the murder statute and that under the facts of this case he would be charged with

first-degree murder. At 8:15 a.m., another break was taken and the defendant was offered coffee and food. He was also allowed to smoke. During that break, the defendant left the room twice and came back on his own accord.

The defendant left the meditation room at 8:45. At 9:30 a.m. the defendant again left and spoke with his family in the hallway. At this time Reverend Anderson came into the meditation room and asked Birkett if they could go to another part of the hospital. Birkett asked the defendant if he would continue the conversation, and he agreed to do so. They moved to a conference room in another area of the hospital.

At 9:52 a.m., Birkett gave the defendant his *Miranda* warnings. However, he continued to tell the defendant that he was not in custody. The defendant said that he had thought about suicide. Birkett told him that he was a "good man," but the defendant responded that he did not feel like a good man anymore. Birkett then told the defendant about Barbara Lang, a woman who murdered her husband while he was sleeping. Lang initially denied committing the crime, but then admitted that she had stabbed him because he had repeatedly abused her. Birkett informed the defendant that based upon these mitigating factors Lang had been convicted of second-degree murder and given probation. Birkett stated that if the defendant had some mitigating factor, he should say so now.

At 10:55 a.m., the defendant indicated that he would tell them what had happened at his house, but that he first wanted to speak with his family. The defendant was allowed to speak with his father and brother in the conference room while Birkett and the other detectives waited in the hallway. After 10 minutes, the defendant's father opened the door. Birkett saw that the defendant was using the phone. The defendant's father told Birkett that the defendant wanted to speak to an attorney. Birkett stated that if the defendant wanted an attorney, he would have to ask for one himself.

At approximately 11:40 a.m., Birkett and the defendant drove in a squad car to the defendant's house, where, in response to questions about the murder, the defendant stated that he "did it" and would clear up the whole case. The defendant then stated for the first time that he wanted to speak to an attorney. Birkett again told the defendant that he was free to leave. Birkett and the defendant then drove to the sheriff's office.

At approximately 1:30 p.m., the defendant made some phone calls in order to locate his attorney. The defendant was unable to reach his lawyer, so Birkett asked the defendant if he wanted to have a public

defender appointed until his private counsel arrived. The defendant agreed and Birkett called Judge Bongiorno, who appointed the public defender. The defendant was charged with first-degree murder at 3 p.m.

Assistant Public Defender Nicholas Kirkeles testified that he and his supervisor, Stephen Baker, arrived at the sheriff's office in the afternoon hours on May 18, 1990. Kirkeles, Baker, and the defendant stepped into an office and talked. Birkett subsequently knocked on the office door, and Kirkeles, Baker, and Birkett then walked into the hallway. Birkett indicated that if the defendant would tell him where the gun was located, he would contemplate a charge of voluntary manslaughter. Kirkeles and Baker went back and talked to the defendant. Baker recommended that the defendant disclose the location of the gun to Birkett, and the defendant agreed. Baker and Kirkeles then told Birkett that the gun was under the front seat of the defendant's truck.

Assistant Public Defender Stephen Baker's testimony was similar to that of Kirkeles. Baker testified that Birkett asked him at the sheriff's office whether the defendant would disclose the location of the gun. "Some mention" was made about the possibility of voluntary manslaughter. Baker advised the defendant to comply with Birkett's request, and the defendant agreed that Baker and Kirkeles could tell Birkett where the gun was located.

The defendant testified at the hearing on his motion to suppress that he had "constantly" asked to leave the hospital. However, each time he asked to leave, Kurzawa, Mitchell and Birkett told him that he would be permitted to leave after a few more minutes of questioning. The defendant also testified that Birkett told him "a couple dozen times" that he did not believe his story, and that if the defendant left the hospital he would be indicted for first-degree murder. The defendant was also told that if he cooperated, Birkett would arrange for the same type of work release sentence which Barbara Lang had received.

The defendant testified that he was not aware that he could just walk out of the hospital, and he did not recall Birkett telling him that he was free to leave. From 2 a.m. to 4 p.m., he never left the presence of the police. However, the defendant did admit to one occasion in which he was allowed to leave the meditation room to answer a phone call in the lobby. The defendant stated that although the exit was about 10 feet away and he had the keys to the truck in his pocket, he voluntarily returned to the meditation room after taking the phone call.

The defendant further stated that Birkett never told him his *Miranda* rights. The defendant testified that he first asked for an attorney at 10:30 a.m., but that Birkett continued to question him about the homicide. The defendant said that he "forgot" that he did not have to answer questions after requesting the presence of counsel. The defendant also denied ever telling Birkett that he would find the gun.

The defendant's brother, Wayne McDaniel, testified that he arrived at the hospital at approximately 2 a.m. on May 18, 1990, and spoke with the defendant until 4 a.m. At approximately 4 a.m., law enforcement officials asked Wayne to leave the meditation room so that they could speak with the defendant. Between 6 a.m and 7 a.m, Wayne demanded to talk to the defendant. However, Wayne was not allowed to talk to his brother again until approximately 10:30 a.m. After speaking with the defendant, Wayne told Birkett that he was going to get a lawyer. Wayne also testified that as he left the room, he heard his brother ask for an attorney. Wayne further testified that he never saw the defendant walking freely about the corridors.

Samuella Bosby, the defendant's sister, testified that she arrived at the hospital at 8 a.m. on May 18, 1990, and asked to see the defendant. A policeman standing outside the room in which the defendant was being questioned "did not invite" her into the room. When the defendant came out of the room at 9 a.m., she was allowed to embrace him for only a second before he was shoved onto an elevator by police officers. Another sister, Betty Brown, testified that she asked to see the defendant at 9:30 a.m. on May 18, 1990, but was not permitted to do so.

Hospital chaplain David Anderson testified that he was with the defendant in the meditation room of the hospital "off and on" from 2 a.m. to 4:45 a.m. on May 18, 1990. At 4:45 a.m., the police asked Anderson to leave the meditation room and the door to the room was then shut. Dr. Victor Trinkus testified that he was at the hospital on May 18, 1990, but was not permitted to stay with the defendant in the meditation room while he was answering questions.

The trial court denied the defendant's motion to suppress. The court ruled that the defendant had been given his *Miranda* rights at 9:52 a.m. and had not been in custody prior to that time. The court further found that the statements obtained from the defendant were voluntary and "not as result of force, threats, intimidation or promises of any kind."

The first issue before this court is whether the trial court erred in ruling that the defendant was not in custody prior to being given his

*Miranda* rights at 9:52 a.m. Only statements made during the course of custodial interrogation or where an individual's freedom has otherwise been significantly restrained must be preceded by *Miranda* warnings. (*People v. Smith* (1986), 150 Ill. App. 3d 524, 527.) In determining whether an interrogation is custodial, the court must focus on all of the circumstances surrounding the questioning and then objectively evaluate whether a reasonable innocent man would have believed himself to be in custody if he were in the defendant's position. *Smith*, 150 Ill. App. 3d at 528.

Relevant factors in determining whether statements were made in a custodial setting include: the location, length, mood and mode of the interrogation; the number of police officers present; any indicia of formal arrest or evidence of restraint, the intention of the officers; and the extent of knowledge of the officers and the focus of their investigation. (*People v. Brown* (1990), 136 Ill. 2d 116, 124-25.) The court should also consider the presence or absence of family and friends of the accused; the manner in which the person questioned got to the place of interrogation, whether he was allowed to walk within and from the location of interrogation unaccompanied by police, and the age and intelligence of the accused. (*Smith*, 150 Ill. App. 3d at 528.) A reviewing court may not disturb the trial court's ruling on a motion to suppress unless it is manifestly erroneous. *People v. Savory* (1982), 105 Ill. App. 3d 1023, 1028.

 In this case, a reasonable innocent person in the defendant's position would not have believed himself to be in custody prior to being given his *Miranda* rights at 9:52 a.m. The defendant voluntarily drove himself to the hospital, where he spoke with his brother for approximately two hours. Detectives Mitchell and Kurzawa then began to question the defendant in the meditation room at the hospital, where he was offered food and coffee. Mitchell testified that the defendant was not handcuffed, restrained or threatened. Assistant State's Attorney Birkett later joined Mitchell in questioning the defendant. The defendant was not restrained in any manner, and Birkett testified that he continually told the defendant that he was not in custody. The defendant stated that he wanted to stay and cooperate. Birkett further testified that the defendant left the meditation room on several occasions, talked with his family, used the rest room, and made phone calls. In considering the circumstances of the interrogation, we are also mindful that the defendant holds bachelor's and master's degrees and is a former police officer.

Although the defendant presented testimony contradicting Mitchell, Kurzawa, and Birkett, it is the province of the trial court in a

hearing on a motion to suppress to determine the credibility of witnesses and the weight to accord their testimony. (*People v. Pinkham* (1985), 139 Ill. App. 3d 554, 557.) The trial court found the testimony of Mitchell, Kurzawa and Birkett to be credible and it denied the defendant's motion to suppress. On review of the record, we cannot say that the trial court's decision was manifestly erroneous.

The cases cited by the defendant, *People v. Savory* (1982), 105 Ill. App. 3d 1023, and *People v. Gorman* (1991), 207 Ill. App. 3d 461, are inapposite. In *Savory*, the defendant was a 14-year-old boy who was convicted of two offenses of murder. The court held that the defendant was in custody when he was interrogated at the police station and the officers pointed out discrepancies between his story and their own information. (*Savory*, 105 Ill. App. 3d at 1029.) However, unlike this case, the court held that relevant to their finding was the fact that the defendant was only 14 years of age and that the officers testified that the defendant was not free to leave the police station. *Savory*, 105 Ill. App. 3d at 1029.

In *Gorman*, the three defendants were charged with two counts of arson arising from a fire at the University of Illinois. They were individually questioned by university police department investigators, but none of them was given *Miranda* warnings prior to being interviewed. The trial court granted the defendants' motion to suppress and the appellate court affirmed, holding that the trial court's determination was not manifestly erroneous. Unlike this case, though, the record revealed that one of the defendants was told that he could not talk to his friends or leave until the interview was over, another defendant was ordered back to the office by a police officer, and the third defendant was interviewed as a police investigator blocked the door. *Gorman*, 207 Ill. App. 3d at 476.

We next address the defendant's argument that incriminating statements were impermissibly obtained from him after he allegedly invoked his right to counsel while at the hospital at approximately 10:30 a.m. on May 18, 1990. In *Miranda*, the United States Supreme Court established certain procedural safeguards which were designed to protect an accused's fifth amendment right against self-incrimination. One of these procedural safeguards mandates that if an accused indicates that he wishes to consult with an attorney before speaking there can be no questioning. However, this right to counsel guarantee relates only to *custodial* interrogation. *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612; *McNeil v. Wisconsin* (1991), 501 U.S. 171, 177-78, 115 L. Ed. 2d 158, 168, 111 S. Ct. 2204, 2208-09.

■■■ The defendant argues that he was in custody after being given *Miranda* warnings at 9:52 a.m. However, a custodial situation cannot be created by the mere giving of *Miranda* warnings. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 171.) Our review of the circumstances surrounding the questioning of the defendant from the time he was given his *Miranda* warnings until he was taken to the sheriff's office indicates that Birkett repeatedly told the defendant that he was not in custody. The defendant responded that he understood. The defendant was not threatened or restrained in any manner. Further, he was allowed to take breaks from the questioning and speak with his family. A reasonable innocent man in the defendant's position would not have believed himself to be in custody. (*Smith*, 150 Ill. App. 3d at 528.) Since the defendant was not in custody until he was taken to the sheriff's office, the assistant State's Attorney and other law enforcement officials were not required prior thereto to cease questioning the defendant after he requested an attorney. The trial court's ruling that the defendant was not denied the right to counsel is not manifestly erroneous.

We recognize that the Appellate Court for the First District in *People v. Spivey* (1991), 209 Ill. App. 3d 584, held that a defendant may invoke his fifth amendment right to counsel prior to the initiation of custodial interrogation. In *Spivey*, a 14-year-old girl was raped and murdered. Police detectives attempted to interview the defendant at a hospital while he was recuperating from injuries suffered when he jumped from a second-floor window. The defendant, who was neither under arrest nor in police custody, requested the presence of counsel. The detectives left. Shortly thereafter, the defendant was released from the hospital, and as he attempted to get in his car, he was arrested and transported to the police station. *Spivey*, 209 Ill. App. 3d at 586-87.

The trial court granted the defendant's motion to suppress a statement he made at the police station, ruling that the giving of *Miranda* warnings after the arrest was ineffective to overcome the prior invocation of the defendant's rights. (*Spivey*, 209 Ill. App. 3d at 589.) The Appellate Court, First District, affirmed, holding that once the invocation of counsel is made, even prior to custodial interrogation, all questioning must cease. *Spivey*, 209 Ill. App. 3d at 592.

We decline to follow *Spivey* because it conflicts with *Miranda*'s holding that an individual can invoke the fifth amendment right to counsel only when he is in custody. As our supreme court stated in *People v. Patterson* (1992), 146 Ill. 2d 445, 451:

"The *Miranda* safeguards arose out of a concern that individuals interrogated while in custody might incriminate themselves due to physical or psychological coercion. (*Miranda*, 384 U.S. at 446-58, 16 L. Ed. 2d at 707-14, 86 S. Ct. at 1613-19.) The *Miranda* Court pointed out that the object of custodial interrogation is to subjugate the individual to the will of his examiner. The interrogation environment 'carries its own badge of intimidation.' (*Miranda*, 384 U.S. at 457, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.) Thus, unless adequate protective measures are employed to dispel the coercion inherent in the custodial environment, no statement obtained from the individual can truly be the product of his free choice. *Miranda*, 384 U.S. at 457, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619."

The defendant in this case was not in custody when he allegedly requested counsel at 10:30 a.m., and he could have simply left without answering any further questions. The trial court did not err in ruling that the defendant's right to counsel was not violated.

The defendant next argues that his incriminating statements, including an alleged confession, were not made voluntarily. Although the defendant was not in custody at the time he made those statements, a noncustodial interrogation might, in special circumstances, be characterized as one where " 'the behavior of . . . law enforcement officials was such as to overbear [the suspect's] will to resist and bring about confessions not freely self-determined.' " (*Beckwith v. United States* (1976), 425 U.S. 341, 348, 48 L. Ed. 2d 1, 8, 96 S. Ct. 1612, 1617, quoting *Rogers v. Richmond* (1961), 365 U.S. 534, 544, 5 L. Ed. 2d 760, 768, 81 S. Ct. 735, 741.) We must therefore examine the record in order to determine that the defendant's statements were voluntary.

Whether a statement is given voluntarily depends on the totality of the circumstances. (*People v. Melock* (1992), 149 Ill. 2d 423, 447.) The question is whether the statement was made freely, voluntarily, and without any compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*People v. Clark* (1986), 114 Ill. 2d 450, 457.) Factors to be considered include the duration of the questioning, the age, education and intelligence of the accused, and whether he was subjected to any physical punishment. (*Melock*, 149 Ill. 2d at 447.) The accused's emotional state and experience in criminal matters are also relevant. (*People v. Stevens* (1989), 188 Ill. App. 3d 865, 876.) The trial court's finding on a question of the voluntariness of a confession will not be reversed unless it

is against the manifest weight of the evidence. *Melock*, 149 Ill. 2d at 448.

■ The defendant first contends that Assistant State's Attorney Birkett's initial hostility towards him overcame his will. The defendant argues that Birkett repeatedly accused him of killing his wife and staging the burglary, and that this interrogation occurred while the defendant was fatigued, distraught and emotionally overwhelmed from seeing his wife's body. However, rigorous and accusatorial questioning does not render a subsequent confession involuntary. (See *Melock*, 149 Ill. 2d at 452.) Furthermore, although the defendant may have been emotionally overwhelmed from viewing his wife's body, he testified that he was able to understand and answer the questions posed to him.

The defendant next contends that Birkett threatened him with a grand jury indictment if he walked out of the interrogation. However, Birkett testified that he told the defendant that he was free to leave, but that if he left, the case would still go to the grand jury where he *might* be indicted. This case is similar to *People v. Pinkham* (1985), 139 Ill. App. 3d 554, in which the defendant testified that police officers told him the victim was in "real bad shape" and the defendant could face attempted murder and, if the victim died, murder. (*Pinkham*, 139 Ill. App. 3d at 556.) This court held that a truthful representation to the defendant about the possibility of a murder charge was not inherently coercive. (*Pinkham*, 139 Ill. App. 3d at 559.) Similarly, Birkett's truthful representation to the defendant about the possibility of a grand jury indictment did not render the defendant's confession involuntary.

The defendant next argues that Birkett induced him to confess by telling him that his case was similar to Barbara Lang and that, like her, he would receive a work release sentence. An offer of leniency is a factor to be considered in determining whether a statement is voluntary. (*People v. Ruegger* (1975), 32 Ill. App. 3d 765, 769.) In *Ruegger*, the defendant testified that a police detective told him that he had gotten probation for one of the defendant's friends who had pled guilty and that other people who had made statements received probation. The defendant also testified that the detective offered to "go to bat" for him if he confessed. (*Ruegger*, 32 Ill. App. 3d at 767.) The detective denied offering to help the defendant or telling the defendant that he had helped others in the past. (*Ruegger*, 32 Ill. App. 3d at 768.) The trial court granted the defendant's motion to suppress, ruling that the State had not met its burden of showing that his confession was not a product of compulsion exerted on him in the form of

offers of assistance. (*Ruegger*, 32 Ill. App. 3d at 768.) The appellate court affirmed, holding that the trial court's finding was not against the manifest weight of the evidence. *Ruegger*, 32 Ill. App. 3d at 771.

In this case, Birkett testified that he told defendant about Barbara Lang. However, he never admitted to promising the defendant that he would receive probation or work release if he confessed. Unlike *Ruegger*, the trial court found Birkett to be credible and it ruled that he made no promises of leniency. It is the function of the trial court to determine the credibility of witnesses and to resolve any conflict in their testimony. (*Melock*, 149 Ill. 2d at 432.) From the record before us, we cannot say that the trial court's finding was against the manifest weight of the evidence.

The defendant claims that the length of questioning is another factor showing that his confession was involuntary. The defendant argues that he did not make any incriminating statements until about 10:30 a.m, more than six hours after the interrogation began. However, the defendant was not subject to continuous questioning during that time. He was allowed to take breaks, go to the rest room and talk with his family. We do not find that the length of the interrogation renders his subsequent confession involuntary. See *People v. Patterson* (1986), 140 Ill. App. 3d 421, 426 (the defendant's 43-hour confinement did not render a subsequent incriminating statement involuntary where he was not refused access to family and friends or denied food or opportunities for rest).

Finally, the defendant argues that his confession was involuntary because it was elicited as a result of a deliberate misrepresentation by Birkett. The claimed misrepresentation concerned statements by Birkett that the defendant was a "good man" whose act of killing his wife in her sleep showed that he did not want her to suffer. Birkett admitted that he did not believe those statements.

Our supreme court has held that a misrepresentation which prompts inculpatory statements does not invalidate a confession as a matter of law. (*People v. Martin* (1984), 102 Ill. 2d 412, 427; *People v. Kashney* (1986), 111 Ill. 2d 454.) In *Martin*, the police and the assistant State's Attorney falsely told the defendant that his codefendant had named him as the "triggerman" in a homicide. (*Martin*, 102 Ill. 2d at 427.) The defendant then made incriminating statements. The court examined the totality of the circumstances and held that the incriminating statements were voluntarily given. (*Martin*, 102 Ill. 2d at 427-28.) In *Kashney*, the assistant State's Attorney falsely told the defendant, as he was being questioned about a murder, that his fingerprints "were found all over the apartment." (*Kashney*, 111 Ill. 2d

at 465.) The defendant subsequently confessed to the crime. The court held that the misrepresentation by the assistant State's Attorney did not vitiate the otherwise voluntary statements. *Kashney*, 111 Ill. 2d at 466-67.

Birkett's statements were less likely to overcome the defendant's will than those made in *Martin* and *Kashney* because they were not a misrepresentation that the police possessed some direct evidence of guilt. After examining the totality of the circumstances, we find that the defendant's inculpatory statements were made freely and voluntarily.

We next address the defendant's argument that the public defenders, who were appointed to represent the defendant at the sheriff's office, denied him effective assistance of counsel. In order to succeed on a claim of ineffective assistance of counsel, the defendant must show that his counsel's representation fell below an objective standard of reasonableness and deprived him of a trial " 'whose result is reliable.' " (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, quoting *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) The defendant must also demonstrate sufficient prejudice that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Albanese*, 104 Ill. 2d at 525, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) If the ineffective assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, the court need not decide whether his counsel's errors were serious enough to constitute less than reasonably effective assistance. *People v. Caballero* (1992), 152 Ill. 2d 347, 365.

The defendant argues that the public defenders' conduct fell below an objective standard of reasonableness because at the sheriff's office they disclosed to Birkett the location of the gun. The defendant contends that he was prejudiced because at trial the State was able to call Assistant Public Defender Baker as a witness and elicit his testimony that the defendant told him that the gun was in the pickup truck. This testimony contradicted the defendant's statement to Birkett that he had not seen the gun in some time because he had given it to his wife.

We first note that Baker's testimony did not violate the attorney-client privilege. The attorney-client privilege exists in order that a person may consult freely and openly with an attorney without any fear of compelled disclosure of the information communicated. (*People v. Adam* (1972), 51 Ill. 2d 46, 48, *cert. denied* (1972), 409 U.S. 948, 34

L. Ed. 2d 218, 93 S. Ct. 289.) However, matters a client intends to disclose to third parties, who are not agents of either the attorney or the client, are not privileged. (*In re Himmel* (1988), 125 Ill. 2d 531, 542; *Cesena v. Du Page County* (1990), 201 Ill. App. 3d 96, 112, *rev'd on other grounds* (1991), 145 Ill. 2d 32.) In this case, the defendant intended that his statement to Baker concerning the location of the gun be disclosed to a third party, Birkett. We therefore find that the defendant waived any privilege he had with respect to this statement.

Furthermore, the evidence against the defendant was overwhelming, even without Baker's testimony about the location of the gun. The defendant waited approximately 45 minutes after allegedly discovering that his wife had been shot before calling 911 and he provided conflicting testimony about whether he entered his house before calling for help. The defendant claimed that he stopped at a gas station and 7-Eleven store before returning home on the night of the murder, but the State presented witnesses who disputed the defendant's testimony. When the police arrived at the defendant's home, they found no evidence of a forced entry and no footprints in the backyard. The defendant told investigators that he did not have a girlfriend, but a co-worker testified that she and the defendant were sexually intimate and were planning on marrying. Birkett testified that the defendant confessed to the crime and Detective Panacchia testified that the defendant told him that he did not have to worry about the gun because he would solve the case today.

Further, at approximately 12:05 p.m. on May 18, 1990, police detectives found a gun in the pickup truck which the defendant had driven home from work. That gun had been discharged one time. This discovery was made approximately two hours *before* Assistant Public Defender Baker told Birkett the location of the gun.

We find that there is no reasonable probability that the defendant would have been found innocent if Assistant Public Defender Baker had not testified against him. Since the defendant did not suffer prejudice from the assistant public defender's testimony, he cannot prevail on his claim for ineffective assistance of counsel.

The defendant next argues that the prosecutor improperly referred to his failure to testify at trial. The comments complained of were made during rebuttal argument. The prosecutor stated:

"And defense counsel in his argument goes through every witness. And I guess when you have nothing to say or very little to say, you go through every witness and take up some time. I don't know.

But one thing that was not commented upon was this: This was found in the Defendant's truck. What is the explanation for that?

MR. LYNCH [Defense counsel]: We will object, motion for mistrial. Motion for mistrial.

THE COURT: Motion is denied.

MR. BURKE: [Prosecutor]: Ladies and gentlemen, what you have is proof beyond a reasonable doubt, that gun is proof beyond a reasonable doubt."

The defendant also complains of a comment made by the prosecutor later in his rebuttal. The prosecutor said "[h]ow did the gun get in the truck? You have no evidence how that gun got in the truck." However, defense counsel waived review of that comment by not objecting to it at trial. *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

An accused has a constitutional right not to testify as a witness in his own behalf and the prosecutor cannot directly or indirectly comment on the exercise of that right. (*People v. Arman* (1989), 131 Ill. 2d 115, 125-26.) However, the prosecution may describe the State's evidence as uncontradicted, even though the defendant is the only one who can contradict it, as long as the comments are not intended to direct the jury's attention to the defendant's silence. (*People v. Leonard* (1988), 171 Ill. App. 3d 380, 386.) When determining whether the accused's right not to testify has been violated, a reviewing court should examine the challenged comments in the context of the entire proceeding. *Arman*, 131 Ill. 2d at 126.

The defendant contends that the prosecutor's comments were similar to those held improper in *People v. Burton* (1969), 44 Ill. 2d 53. There, the court held that the prosecutor had specifically referred to the defendant's failure to testify by stating that "*he's* got to explain the blood on the pants" and by pointing out that there was no explanation "from *him*" as to the source of the bloodstains. (Emphasis in original.) (*Burton*, 44 Ill. 2d at 57.) However, unlike *Burton*, the prosecutor in this case refers to defense *counsel's* failure to present witnesses who can explain why the gun was found in the defendant's truck.

The defendant also argues that this case is like *People v. Arman* (1989), 131 Ill. 2d 115. There, the defendant was convicted of narcotics racketeering. Evidence introduced at trial included a series of photographs that showed the defendant allegedly engaged in a drug transaction with an undercover police officer in the parking lot of a Wendy's restaurant. (*Arman*, 131 Ill. 2d at 122.) In closing argument, defense counsel asserted that the photographs showing the defendant at the restaurant did not establish that he was there to complete a narcotics

transaction. In rebuttal, the prosecutor referred to the failure of the defense to provide an explanation for the defendant's presence at the restaurant. (*Arman*, 131 Ill. 2d at 126.) The court held that the prosecutor's argument constituted an impermissible comment on the defendant's failure to testify. *Arman*, 131 Ill. 2d at 126.

However, our supreme court has also held that a defendant cannot claim error where the prosecutor's remarks are in reply to and were invited by defense counsel's argument. (*People v. Dixon* (1982), 91 Ill. 2d 346, 350-51.) In *Dixon*, defense counsel advised the jury during closing argument to "keep in mind what is going on in [defendant's] mind." (*Dixon*, 91 Ill. 2d at 350.) In rebuttal, the prosecutor stated: "Do you know what was happening in [defendant's] mind? Did you hear any testimony whatsoever of what was going on in [defendant's] mind?" (*Dixon*, 91 Ill. 2d at 350.) The court held that the prosecutor's remarks were made in response to defense counsel's argument and were not a reference to the defendant's decision not to testify. *Dixon*, 91 Ill. 2d at 351.

■ Here, the prosecutor's comments about defense counsel's failure to call witnesses explaining why the gun was found in the defendant's truck were made after defense counsel had commented on the State's failure to prove that the defendant had fired the gun or that the bullet came from that gun. We believe that the prosecutor's comments in this case, in the context of the entire proceedings, were not made for the purpose of calling attention to the defendant's failure to testify but were proper rebuttal invited by defense counsel's argument.

■ Lastly, the defendant argues that the evidence at trial was insufficient to prove that he was guilty of murder. When reviewing the sufficiency of evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) (*People v. Young* (1989), 128 Ill. 2d 1, 49, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) As we discussed in our analysis of the defendant's ineffective assistance of counsel claim, the evidence was sufficient to support the defendant's conviction.

For the foregoing reasons, we affirm the trial court.

Affirmed.

COLWELL and BOWMAN, JJ., concur.