# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Beltran*, 2011 IL App (2d) 090856

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTINA BELTRAN, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-09-0856 |
| Filed | August 23, 2011 |
| Modified upon denial of rehearing | September 14, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the first degree murder of her five-year-old daughter was upheld over her contentions that the trial court erred in denying her motion to suppress the statements she made to the police and recorded statements she made while alone and that prosecutorial misconduct during closing and rebuttal argument deprived her of a fair trial. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 07-CF-1882; the Hon. George J. Bakalis, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Thomas A. Lilien and Darren E. Miller, both of State Appellate Defender's Office, of Elgin, for appellant. |
| | |
| | Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman, Assistant State's Attorney, and Lawrence M. Bauer, Jay Paul Hoffmann, and Sally A. Swiss, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. |
| | Justices Zenoff and Burke concurred in the judgment and opinion. |

## OPINION

¶ 1 Following a jury trial, the defendant, Christina Beltran, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2006)) for killing her five-year-old daughter, Evelyn. The defendant was sentenced to 40 years' imprisonment. On appeal, the defendant argues that (1) the trial court erred in denying her motion to suppress certain statements; and (2) she was deprived of a fair trial due to certain improper prosecutorial comments. We affirm.

¶ 2 On July 14, 2007, the defendant was charged by criminal complaint with first degree murder (720 ILCS 5/9-1(a)(2) (West 2006)). The complaint alleged that the defendant killed the victim by repeatedly slamming her head on the ground.

¶ 3 On October 23, 2007, the defendant filed a motion to suppress statements that she gave to the police on July 7 and July 13, 2007. The motion alleged that on July 6, 2007, the defendant drove her daughter to the hospital. After she learned that her daughter had died, the defendant suffered an acute psychological breakdown. Hospital staff subdued the defendant by injecting her with Haldol and placing her in four-point leather restraints. While at the hospital on July 7, the police questioned her regarding the victim's death. The police then improperly elicited statements from her prior to informing her of her *Miranda* rights. The motion further alleged that police elicited statements from her at the Du Page County Children's Center on July 13 in violation of her *Miranda* rights.

¶ 4 On August 28 and 29, 2008, the trial court conducted a hearing on the defendant's motion. Dr. Guy Miller testified that on July 6, 2007, he was treating the defendant in the emergency room when she began "violently thrashing about and appeared to be under extreme duress." The defendant believed that she was pregnant and 15 years old. Dr. Miller noted that the defendant "appeared to be seeing things in the room and pointing to things in the room that were not there, and she appeared to be talking to herself." At one point, the defendant attempted to "strangle herself with a bed sheet," and Dr. Miller had to physically restrain her. Dr. Miller opined that the defendant had an acute psychotic breakdown. Dr.

Miller placed her in four-point leather restraints and sedated her by giving her five milligrams of Haldol.

¶ 5        Dr. Miller described Haldol as an "anti-psychotic and sedative." He treated the defendant with Haldol at about 9 p.m. on July 6, 2007. The half-life of Haldol is 18 hours, meaning that, 18 hours after a person takes a dose of Haldol, half of that dose remains in that person's system. After the defendant was injected with Haldol, Dr. Miller observed that she was more calm and coherent. On July 7, 2007, the defendant was committed at Linden Oaks Hospital, the mental health treatment center for Edward Hospital.

¶ 6        On July 7, 2007, at 5:45 a.m., Robert Holguin and Investigator Easton, both investigators with the Du Page County State's Attorney's office, Sergeant Price of the Du Page County sheriff's office, and Detective Barr of the Woodridge police department arrived at Edward Hospital to serve a search warrant and interview the defendant. Prior to entering the defendant's room, Holguin talked with the "charge nurse" to see if the defendant was lucid and if it would be okay to talk with her. The nurse said it would be fine and gave the officers and investigators permission to enter the defendant's room.

¶ 7        Holguin spoke with the defendant during the July 7 interrogation, which was recorded on video and audio. The transcript from the recording reveals that Holguin told the defendant that they had a search warrant. Holguin then informed her, "you don't have to talk to us, you don't have to talk to us if you don't want to, okay." He then told her that her brother, her boyfriend, and her boyfriend's family were very worried about her. Holguin then asked the defendant who caused the injuries that led to the victim's death. The defendant said that she had hit the victim, and Holguin and the defendant discussed how the defendant struck the victim. The defendant said that she did not hit the victim hard, and Holguin told the defendant to "remember that we talked to Victor" (Jimenez, the defendant's live-in boyfriend and the father of her twin sons). Later during the interrogation, the defendant said that it was she, not Jimenez, who had caused the victim's injuries.

¶ 8        After the defendant asked Holguin if it was wrong to tell him what had occurred, Holguin replied that it was fine. Holguin told the defendant that she was not detained, but he wanted to know what transpired "because we're here for your protection." Holguin additionally stated that, because they were there to protect the defendant, he was going to read her rights to her. Holguin then read to the defendant her *Miranda* rights.

¶ 9        The defendant subsequently signed and initialed a Spanish *Miranda* waiver. During the reading of the waiver, when the defendant was told of her right to counsel, the defendant said, "But I don't have an attorney." Holguin responded that the defendant could "ask for one at a point," but "[f]or right now" he just wanted to "clarify what happened."

¶ 10        After executing the written waiver, the defendant asked, "So [unintelligible] I can't talk to you guys right now?" Holguin replied that the defendant did not have to speak with them, but that it was important to determine what happened. Holguin asked the defendant if she wished to continue speaking with him, and the defendant replied, "No." Holguin asked the defendant again if she wanted to speak with the officers, and the defendant replied, "I don't know." Holguin told the defendant that they had already spoken with her brother and Jimenez. Holguin said that there would be an autopsy and that the police would determine

"what happened and why [the victim] died." Holguin asserted that, if they did not know the defendant's version, there would be "no explanation why you did what you did with [the victim]." Holguin stated, "We need to hear it from you." He reminded the defendant that she had "started real well talking to us" and that she had already "explained to us the things you did to [the victim]." When Holguin asked what the defendant thought, she said, "Nothing."

¶ 11    Holguin continued by telling the defendant that she had to "think about her children." He asked her if she had "gotten some good rest," to which she replied, "No." Holguin again asked the defendant if she wanted to continue speaking with them. The defendant replied, "You say to." Holguin responded, "[n]o," and the defendant said, "[y]ou say it's important." Holguin said that it was important for the defendant to talk and that he wanted her to agree to talk. He asked her again if she would talk, and the defendant replied, "yes you say it's important." Thereafter, the defendant spoke with Holguin.

¶ 12    On cross-examination, Holguin stated that he had no reason why he waited to read the defendant her *Miranda* rights. He later testified that he continued to question the defendant because he felt that she was not in custody.

¶ 13    As to the July 13 interview, Holguin testified that he was aware that the defendant was going to be released from Linden Oaks that day. He and Investigator Easton drove Jimenez, who had agreed to wear a recording device pursuant to a court-authorized overhear, to pick up the defendant from the mental hospital. The investigators drove Jimenez and the defendant from Linden Oaks to the Du Page County Children's Center. The defendant and Jimenez were left alone in an interview room, where they engaged in a conversation that was recorded. At some point, the defendant got up and began to open the door. Holguin then approached the defendant and told her that he needed to speak with her. Holguin told the defendant that he needed "a minute," and he left the defendant alone in the room for a couple of minutes before he and Easton returned. Holguin asked the defendant if she would agree to speak with him, and the defendant so agreed. Holguin's July 13 interview with the defendant was recorded on video and was transcribed into English.

¶ 14    The transcript reveals that, at the start of her interview with Holguin, she said, "Oh my babies. Oh, my little babies." Holguin asked defendant to sit down, and she replied that she did not want to sit. Holguin told the defendant that he needed her to sit down "because these rooms are recorded." The defendant agreed to sit, and Holguin asked if she recalled everything they had talked about. The defendant responded that she remembered "[s]ome of it." Holguin told the defendant that "we're in our office now" and that he was grateful that she agreed to speak with him.

¶ 15    Holguin told the defendant that the only way to "fix this is talking with the truth." Holguin told her that, although they had spoken with Jimenez and had been investigating the case all week, the nature of the victim's injuries was still unclear. At this point, Holguin told the defendant that he and Easton were "like police officers, normally for your protection, our protection, we read you rights." Holguin informed the defendant that "[i]t doesn't mean anything," and told her that the rights were as he read them to the defendant at the hospital. Holguin stated that he was going to read the defendant her rights, and afterwards "we'll talk" and the defendant could ask about what was happening. Holguin then read the defendant her

rights, the defendant indicated that she understood her rights, and she signed a waiver of rights.

¶ 16 Immediately after signing the waiver of rights, the defendant asked Holguin if he could help her see her other children. Holguin told the defendant that the Department of Children and Family Services (DCFS) had her children because Jimenez knew of the victim's abuse and could not stop it. Holguin informed the defendant that DCFS "grabbed custody of the children" for "as long as we are doing the investigation." After telling the defendant that DCFS would determine if the children would be placed with Jimenez's parents, Holguin said that "they never want to break up a family like that." Holguin said that DCFS would not likely give the children immediately to Jimenez, "[b]ut talking with the truth everything can be fixed." Holguin again told the defendant that the interview was being recorded, and that her cooperation was "very important." Subsequently, the defendant made several inculpatory statements.

¶ 17 During cross-examination, Holguin acknowledged that he knew that the defendant had been treated at Linden Oaks for mental health issues. He testified that, when he told the defendant she could fix everything by speaking with him, he meant that his investigation could be fixed. He acknowledged that it "may have been a poor choice of words" when he told the defendant that her rights did not mean anything. He stated that he said that because he did not want the defendant to feel intimidated. During the interview, the defendant told him that she had only a second grade education.

¶ 18 Dr. Tiffany Masson testified as an expert psychologist for the defense. She testified that she had reviewed the video recordings of the interrogations and the defendant's medical records, and she had spoken with the defendant and her treating psychiatrists. Dr. Masson concluded that the defendant did not voluntarily waive her *Miranda* rights during either the July 7 or the July 13 interview.

¶ 19 Dr. Masson explained that the defendant experienced "psychotic-like symptoms" and was in "a child-like state" prior to being injected with Haldol. In Dr. Masson's opinion, Haldol can affect one's ability to voluntarily waive *Miranda* rights. Possible side effects from Haldol include decreased concentration and alertness, confusion, nausea, shaking, and an increased heart rate. Dr. Masson believed that the defendant remained under the influence of Haldol during the bedside interrogation in the early morning of July 7. The defendant's self-report of feeling drunk, dizzy, and confused during the July 7 interrogation was consistent with being under the influence of Haldol.

¶ 20 Dr. Masson also administered a nonverbal IQ test to the defendant. The test can properly be taken by people who do not speak English, such as the defendant. The defendant scored 79, a low score that is two standard deviations below the average score of 100. Dr. Masson was "extremely confident" that her measurements for the test were accurate. Upon questioning by the trial court, Dr. Masson reiterated her opinion that, although the defendant had a basic understanding of her *Miranda* rights, she was not fully aware of the consequences of waiving those rights.

¶ 21 Dr. Orest Wasyliw, a forensic psychologist, testified that he had done criminal evaluations for the past 15 years. Such evaluations included addressing sanity at the time of

the offense, fitness to stand trial, and fitness to understand and waive *Miranda* rights. In court, he testifies approximately 50% of the time for the defense.

¶ 22　Dr. Wasyliw testified that he had reviewed the records of the defendant's statements, including watching the DVDs of the actual interrogations as well as reading the transcripts from those interrogations. He also reviewed the defendant's medical records. He also met with the defendant twice and performed some tests on her. He believed that the defendant was of average intelligence. He also testified that the defendant's test results suggested that she was exaggerating some of the symptoms of mental illness.

¶ 23　Dr. Wasyliw further testified that, from reviewing the DVDs of the defendant's statements, she did not appear to have any difficulty other than yawning and perhaps a little bit of sleepiness at the beginning of the first interview. He observed that she appeared to be attentive as to what was going on. She was alert. She was oriented. She knew who she was and what was going on around her. She showed good eye contact. He believed that she understood the questions being asked, because she answered those questions appropriately. Further, from his review of the DVDs, he found no evidence of hallucinations, delusions, or illogical thinking. He found no evidence of any side effects from the Haldol that the defendant had taken prior to being interviewed.

¶ 24　Dr. Wasyliw concluded, to a reasonable degree of scientific certainty, that on both July 7 and July 13, the defendant understood her *Miranda* warnings, she appreciated their importance to her, and she was capable of knowingly and voluntarily waiving those rights.

¶ 25　On October 28, 2008, the trial court entered a written decision denying the defendant's motion to suppress her statements. The trial court explained that on July 7 the defendant was not in custody at Edward Hospital and her statements were voluntary. The trial court noted that Dr. Masson believed that the defendant's statements were involuntary because she was under the influence of Haldol. The trial court found, however, that the video of that interview did not show that the defendant was anything other than tired.

¶ 26　Regarding the July 13 interview at the Child Advocacy Center, the trial court found that the defendant was in custody. However, she was informed of her *Miranda* rights prior to giving any statements and the statements she gave were voluntary. Further, the trial court found that the "noninterrogation statement(s)" the defendant made when she was left alone in the interrogation room were admissible.

¶ 27　From January 14 to January 30, 2009, the trial court conducted a trial on the charges against the defendant. Victor Jimenez testified that on July 6, 2007, he lived with the defendant, their twin sons, and the victim. The victim, who turned five years old in May 2007, had come to live with him and the defendant in March 2007. Prior to that, she had lived with the defendant's aunt in Mexico City.

¶ 28　After the victim came to live with them, Jimenez noticed on one occasion that the victim was not able to sit on a chair correctly. Jimenez talked to the victim and asked her to show him why she had difficulty sitting. The victim showed him her buttocks, which had a lot of red, peeling bumps. Jimenez talked to the defendant and she acknowledged that she had caused the marks on the victim's buttocks. On other occasions, about a month prior to the victim's death, Jimenez observed bruises on the victim's hands, arms, waist, and forehead.

He also observed the defendant slap the victim in the face, pull her hair, and push and throw her. The defendant would slap the victim so hard as to leave red marks on the victim's face. The defendant would also yell at the victim, curse her, and tell her that she hated her. He also observed that the victim had a bump on her elbow. A few days before her death, the victim complained of intense stomach pain. Jimenez tried to comfort her as the defendant did not want to help her. The defendant never took the victim to see a doctor prior to July 6, 2007. In early July 2007, Jimenez asked the defendant why she treated the victim the way that she did. The defendant told him that the victim "had been a product of a rape, that she didn't want to have her, and she would curse the hour that she was born."

¶ 29      On July 6, 2007, Jimenez worked only half a day because he had hurt his clavicle and his arm was in a sling. When he came home, the defendant and the twins were there. As the victim was watching television, she lost control of her bowel and bladder. The defendant noticed and started hitting the victim. The defendant called the victim a pig, pulled her hair, and "smacked" her head onto the carpeted floor. The defendant used a lot of force, and it sounded like the victim's head was hitting wood. The defendant hit the victim's head in that fashion three or four times. The defendant yelled that she should have had an abortion. The defendant also slapped the victim in the face. Jimenez testified that he eventually got in between the defendant and the victim to stop the defendant from hitting the victim.

¶ 30      Jimenez then told the victim not to worry and that everything would be okay. The victim could not hold herself up and looked dizzy. He took the victim to the bathroom and yelled for the defendant to help him, but the defendant was hiding in the closet. Jimenez helped the victim get undressed and tried to bathe her. He put her soiled clothes in a bag. He told the defendant that he thought there was something wrong with the victim. The defendant told him that she thought the victim was faking her condition. Subsequently, the defendant took the victim to the hospital.

¶ 31      Jimenez identified the shirt that the victim was wearing the night she died. The shirt had written on it "Heavenly Angels All-Stars." There was hair all over the shirt. The shirt was introduced into evidence.

¶ 32      The defendant testified that on July 6, 2007, Jimenez had grabbed the victim, dropped her by the head, pushed her, and called her a pig. He also hit the victim against the bathroom wall. The defendant testified that she lied to the police when she told them that she was the one who had injured the victim. She explained that she lied because Jimenez asked her to. Jimenez had told her that, if he were arrested for the victim's death, the police would also take away her twin sons. Jimenez told her that, if she accepted blame, he and his family would get her a good attorney to get the twins back.

¶ 33      At the close of the trial, the jury found the defendant guilty of first degree murder. The trial court subsequently sentenced the defendant to 40 years' imprisonment. Following the denial of her motion to reconsider, the defendant filed a timely notice of appeal.

¶ 34      The defendant's first contention on appeal is that the trial court erred in not suppressing her statements from the July 7 and July 13 interrogations. Specifically, the defendant argues that she was in custody during the entire period of both interviews, that any *Miranda* warnings she was given were insufficient because they were the result of an intentional

"question first, *Mirandize* later" technique, and that the statements made while she was alone were made in response to questions posed immediately before she made those statements.

¶ 35    In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). We review *de novo*, however, the ultimate question posed by the legal challenge to the trial court's ruling on a suppression motion. *People v. Nicholas*, 218 Ill. 2d 104, 116 (2005). Further, it is proper for us to consider the testimony adduced at trial, as well as the suppression hearing. *People v. Melock*, 149 Ill. 2d 423, 433 (1992). Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving that the confession was voluntary by a preponderance of the evidence. 725 ILCS 5/114-11(d) (West 2006); *People v. Braggs*, 209 Ill. 2d 492, 505 (2003).

¶ 36    In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that, prior to the start of an interrogation, a person being questioned by law enforcement officers must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed," as long as that person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id.* at 444. The finding of custody is essential, as the preinterrogation warnings required by *Miranda* are intended to ensure that any inculpatory statement made by a defendant is not simply the product of " 'the compulsion inherent in custodial surroundings.' " *Yarborough v. Alvarado*, 541 U.S. 652, 661 (1994) (quoting *Miranda*, 384 U.S. at 458).

¶ 37    The determination of whether a defendant is in custody and, therefore, whether the warnings set forth in *Miranda* are required involves two discrete inquiries. *Slater*, 228 Ill. 2d at 150. "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." (Internal quotation marks omitted.) *Id.* When examining the circumstances of the interrogation, our supreme court has found a number of factors to be relevant in determining whether a statement was made in a custodial setting, including: (1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking, or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused. *Id.* It is also proper to consider whether the defendant had reason to believe that he or she was the focus of a criminal investigation. *People v. Vasquez*, 393 Ill. App. 3d 185, 190 (2009). No single factor is dispositive, and in each case the court considers all of the circumstances. *People v. Reynolds*, 257 Ill. App. 3d 792, 800 (1994). After examining and weighing the various factors, the court then must make an objective determination as to whether, under the facts presented, "a reasonable person, innocent of any crime" would have believed that he or she could terminate the encounter and was free to leave. (Internal quotation marks omitted.) *Slater*, 228 Ill. 2d at 150.

¶ 38    Upon consideration of all the relevant factors, we conclude that the defendant was not

in custody on July 7 when the first videotaped interview was conducted. We note that one factor is contrary to that conclusion–the defendant had reason to believe that she was the target of a criminal investigation. The defendant should have been keenly aware that she would be the subject of a criminal investigation because her daughter had recently died due to a brutal beating in the defendant's home. However, the other relevant factors do not support a finding that the defendant was in custody.

¶ 39    First, we consider the location of the questioning–the defendant's room in the hospital. We note that we recently considered an identical issue in *Vasquez*, 393 Ill. App. 3d at 190-91. In that case, the defendant was hospitalized after being involved in a motor vehicle accident that killed five people. When the police went to the defendant's hospital room, they knew that she had already been ticketed for driving under the influence of alcohol. The defendant subsequently made inculpatory statements to the police. The trial court later granted the defendant's motion to suppress those statements, finding that they had been elicited in violation of her *Miranda* rights. On appeal, this court reversed, determining that the defendant was not in custody when she was questioned in her hospital room. We explained:

> "Other things being equal, a suspect questioned in familiar (or at least neutral) surroundings does not face the same pressures as one questioned in a police-dominated atmosphere. See 2 W. LaFave, J. Israel, N. King & O. Kerr, Criminal Procedure § 6.6(e), at 738-39 (3d ed. 2007). Therefore, questioning at the police station is more likely to be custodial than questioning at the suspect's home. A hospital is a more neutral setting than either the police station or the defendant's home. On the one hand, a hospital room is not as familiar to the interviewee as his or her home. Significantly, however, a hospital room does not produce the aura of police authority that a police department interview room does. Notably, of seven decisions we have found where Illinois courts have considered whether questioning hospital patients violated *Miranda* [citations], in all but one–[a case that was readily distinguishable]–the courts concluded that the defendants were *not* in custody." (Emphasis in original.) *Id.*

As in *Vasquez*, we believe that the fact that the defendant was questioned in a hospital room rather than a police station weighs in favor of finding that the defendant was not in custody.

¶ 40    In so ruling, we find the defendant's attempt to distinguish *Vasquez* unpersuasive. The defendant insists that *Vasquez* is distinguishable because that case "involved a presumably voluntary hospitalization due to injuries sustained in a car accident" while the instant case involved an involuntary commitment to a mental health hospital following a suicide attempt. As we explained in *Vasquez*, for purposes of *Miranda*, courts look to whether the restraints imposed upon the hospitalized defendant were done so by law enforcement officials or medical personnel. *Id.* at 191. Restraints imposed upon a defendant by medical personnel for medical reasons do not implicate *Miranda* concerns. *Id.* Here, it was medical personnel who decided that the defendant should be involuntarily committed. As the police were not involved with the medical personnel's decision that the defendant be involuntarily committed, the fact that she was involuntarily committed does not suggest that she was in police custody.

¶ 41     We next consider the time, length, mood, and mode of the questioning. The defendant was questioned early in the morning, approximately 5:45 a.m. However, neither her appearance on the video nor her statements (reflected in the transcript) suggest that she was too tired to participate in the interview. The length of the interview–approximately 45 minutes–was not atypical of a noncustodial interview. *Cf. id.* at 192 (finding that 35-minute interview was not atypical of a noncustodial interview).

¶ 42     The mood and mode of the questioning likewise support the view that the defendant was not in custody. Holguin told the defendant at the beginning of the interview that she did not have to talk with him. He did not badger the defendant and he did not employ a hostile or accusatory tone. Further, although four officers were present during the interview, only two of them asked questions, with the majority of those questions being asked by Holguin. *Cf. id.* (fact that only two police officers participated in the interview militated against a finding of custody); *People v. Ripplinger*, 316 Ill. App. 3d 1261, 1271 (2000) (same).

¶ 43     There were no family or friends present with the defendant when she was questioned. However, as there were no such people present when the police arrived, it was not a situation where the police created the appearance that the defendant was in custody by asking her family or friends to leave during the interview. *Cf. Vasquez*, 393 Ill. App. 3d at 190 (police asking the defendant's parents to leave the defendant's hospital room so that they could question the defendant was a factor suggesting that the defendant was in custody).

¶ 44     Indicia of a formal arrest procedure were absent. The defendant was not booked, fingerprinted, or handcuffed. No guards were posted outside her hospital room. Although Holguin read the defendant her *Miranda* rights, this did not convert the situation into a custodial arrest. See *People v. McDaniel*, 249 Ill. App. 3d 621, 633 (1993) ("a custodial situation cannot be created by the mere giving of *Miranda* warnings"). Moreover, a custodial situation was not created when Holguin told the defendant that he had a search warrant to execute. See *People v. Leon*, 311 Ill. App. 3d 624, 631 (2000) (defendant was not seized when police entered his apartment pursuant to a search warrant, as opposed to an arrest warrant, and other indicia of seizure–other than one factor–were lacking). We also note that, shortly after Holguin informed the defendant that the police had a search warrant to execute, he told her that she did not have to answer any of his questions.

¶ 45     Finally, we do not believe that the defendant's age, intelligence, and mental makeup weigh in favor of finding that she was in custody. Although Dr. Masson found that the defendant had an IQ of only 79, Dr. Wasyliw disputed that finding. His review of the defendant's records, as well as his interactions with her, indicated that the defendant was of average intelligence. Based on its ruling, it is apparent that the trial court placed greater weight on Dr. Wasyliw's testimony than it did on Dr. Masson's testimony. Based on the standard of review, we cannot say that such a finding was improper. See *Slater*, 228 Ill. 2d at 149. Further, although the defendant had taken the psychotropic medication Haldol the night before the interview, there is no indication from the video recording or the transcript of the interview that the Haldol had any adverse effects upon the defendant when she was being questioned.

¶ 46     The defendant insists that her just having undergone a psychotic breakdown weighs

-10-

heavily in favor of finding that she was in custody. The defendant also points to our supreme court's decision in *People v. Braggs*, 209 Ill. 2d 492, 507 (2003), which determined that "where the investigating officer is aware of particular characteristics or traits of the individual that make him or her particularly vulnerable to the impression that he or she is in custody, and the officer exploits those characteristics in questioning, that, too, is a relevant factor in determining whether the individual is 'in custody' for purposes of *Miranda*." The defendant maintains that Holguin was aware that she was psychologically disturbed and that he took advantage of her frail condition in order to obtain a confession.

¶ 47    We do not believe that Holguin exploited the defendant's condition in order to extract a confession from her. Prior to entering the defendant's room, Holguin asked a nurse if the defendant would be able to talk with him. The nurse indicated that she would. Upon entering the defendant's room, Holguin specifically told the defendant that she did not have to speak with him. Holguin's actions in this regard do not suggest that he was attempting to coerce a confession from the defendant.

¶ 48    In determining that the defendant was not in custody, we also find the defendant's reliance on *Effland v. People*, 240 P.3d 868 (Colo. 2010) (a 4 to 3 decision), to be misplaced. In *Effland*, the police found the defendant's wife and the defendant's adult daughter dead in the defendant's home. The defendant was in another room of the home, shaking and incoherent. The police found a note that contained a suicide pact signed by the three family members. The defendant was subsequently taken to the hospital. He was accompanied by the police. A uniformed police officer was stationed outside his room. *Id.* at 871.

¶ 49    Two days after the defendant was admitted to the hospital, two plain-clothed officers came to talk to him. One of the officers told the defendant that it was important that they hear his version of the events so that they could accurately understand what had transpired. The defendant repeatedly indicated that he wanted to speak with an attorney first. One of the officers told him that he was not entitled to an attorney, because he was not in custody and he had not been charged with a crime. The officer then explained his theory of how the defendant had killed his wife. The defendant cried and agreed with the officer's statements. The defendant then made several inculpatory statements. *Id.* at 871-72.

¶ 50    On appeal, the Colorado Supreme Court determined that the defendant's statements should have been suppressed because they were given while he was in custody and not informed of his *Miranda* rights. The supreme court specifically found that 15 factors supported a finding that the defendant was in custody, including: (1) the defendant was handcuffed when he was removed from his home; (2) the defendant was accompanied to the hospital by a police officer; (3) a uniformed police officer was stationed outside the defendant's hospital room and the evidence presented at trial supported a conclusion that the defendant knew of the officer's presence; (4) the defendant repeatedly informed the investigating officers that he did not wish to speak with them; (5) the defendant repeatedly stated that he wished to consult with an attorney prior to speaking with the investigating officers; (6) the investigating officers continued to ask questions after the defendant informed them he did not wish to speak with them; (7) the investigating officers informed the defendant that he was not entitled to an attorney; (8) the defendant was emotionally distraught and was crying throughout the interrogation; and (9) the defendant's daughter was

excluded from the interrogation. *Id.* at 875-76.

¶ 51    Although the defendant insists that this case is analogous to *Effland*, we find that it is distinguishable. Here, Holguin informed the defendant at the outset that she did not have to talk with the police. The defendant in *Effland* was not given that option. Unlike in *Effland*, the defendant was not removed from her home in handcuffs and a police officer was not stationed outside her room. The defendant never requested to speak with an attorney. Although the defendant at times indicated that she did not want to talk any longer with the police, such comments were equivocal. After the defendant indicated that she did not want to talk with the police, Holguin would ask a clarifying question, such as "You don't want to talk to us anymore?" The defendant would then say, "I don't know," and continue talking with the police. Conversely, in *Effland*, the defendant repeatedly told the police that he did not want to speak with them.

¶ 52    We also find without merit the defendant's argument that the statements the defendant gave on July 7 after she was informed of her *Miranda* rights should have been suppressed. Relying on *Missouri v. Seibert*, 542 U.S. 600, 604 (2004), the defendant argues that the police officers used a "question first, *Mirandize* later" technique that did not adequately and effectively advise of her constitutional rights, including the right not to speak with the police. In *Seibert*, the United States Supreme Court held that a statement given during custodial questioning after *Miranda* warnings is inadmissible when the defendant was initially questioned and made inculpatory statements without the benefit of *Miranda* warnings.

¶ 53    As explained above, the defendant was not in custody when the police interviewed her on July 7. Thus, *Seibert* is inapplicable. Indeed, we note that, in arguing that *Seibert* applies to the facts of this case, the defendant relies on three cases that all involve custodial questioning. See *People v. Lopez*, 229 Ill. 2d 322 (2008) (applying *Seibert* in custodial setting); *People v. Alfaro*, 386 Ill. App. 3d 271 (2008) (same); *People v. Montgomery*, 375 Ill. App. 3d 1120 (2007) (same).

¶ 54    For these same reasons, we reject the defendant's argument that her statements from the July 13 interrogation should have been suppressed. The defendant insists that the July 13 interview "was part of Holguin's deliberate strategy to utilize [her] pre-*Miranda* interrogation against her. The July 13 custodial interrogation was simply an extension of the 'question first, warn later' technique which began on July 7." As the defendant was not in custody on July 7, her being "in custody" on that day cannot serve as a basis for suppressing any of the statements that she made on July 13.

¶ 55    The defendant also contends that Holguin's interrogation of her on July 13 was unfair because, before reading her rights to her, he told her that "[i]t [the *Miranda* rights] doesn't mean anything *** just like I read them to you at the hospital." At the hearing on the motion to suppress, Holguin testified that he used that language to put the defendant at ease and not to convey the impression that her rights were meaningless. In its ruling on the defendant's motion to suppress, the trial court criticized Holguin's choice of language, but ultimately found that such language did not prejudice the defendant. The trial court explained:

        "On the video there was nothing to indicate any hesitation on the part of the defendant after being so advised. There is no question from the defendant to the

-12-

investigator regarding the rights or her ability to exercise them. Certainly the use of the words by the investigator were inappropriate and under certain circumstances might have made the warnings ineffective. The words were spoken one time and not referenced again. Viewed in the totality of the entire interview, the court finds that though inappropriate the words did not cause the defendant to not exercise the rights explained to her."

¶ 56 We agree with the trial court's assessment. Although Holguin's telling the defendant that her *Miranda* rights did not matter was not appropriate, there is no indication in the record that the defendant was prejudiced by that comment. Absent any such prejudice, the defendant is not entitled to any relief. See generally *People v. Young*, 248 Ill. App. 3d 491, 498 (1993) (error is harmless if it does not prejudice or harm the defendant).

¶ 57 Further, we find without merit the defendant's argument that certain comments she made when she was alone (and being recorded) should have been suppressed. The defendant's argument is premised on her earlier contention that she was not effectively Mirandized prior to the July 7 interrogation. As we have already rejected that argument, we necessarily reject her argument that the statements she made when she was alone should also have been suppressed.

¶ 58 The defendant's second contention on appeal is that she was deprived of a fair trial due to prosecutorial misconduct in closing argument and rebuttal. Specifically, the defendant argues that the prosecutors' following comments and tactics served no purpose other than to inflame the passions of the jury: (1) their repeated references to the victim being a heavenly angel; (2) holding up the victim's shirt and saying that all that remained of her were the hairs on her shirt; (3) claiming that the defendant was not worthy of being the victim's mother; (4) asserting that the only solace was that the victim was now an angel free from the defendant; (5) crying while discussing that the victim was a heavenly angel; and (6) needlessly degrading the defense. The defendant contends that, because the prosecution's inflammatory tactics were pervasive, she should be granted a new trial.

¶ 59 Whether statements made by a prosecutor in closing argument were so egregious that they warrant a new trial is a legal issue that this court reviews *de novo*. *People v. Graham*, 206 Ill. 2d 465, 474 (2003). As an initial matter, we address the State's contention that many of the defendant's objections to the prosecution's statements are forfeited. To preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The defendant failed to properly object to the comments of which she now complains, other than her objection when a prosecutor was purportedly crying during closing argument.

¶ 60 Nonetheless, we may still consider all of the comments of which the defendant complains. As our supreme court in *People v. Wheeler,* 226 Ill. 2d 92, 122-23 (2007), explained:

"[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context. [Citation.] Accordingly, the simple fact that defendant did not properly object to a statement does not render that statement as if it never existed. Indeed,

-13-

all statements must be considered as part of the entirety of a prosecutor's closing argument, and even statements not properly objected to may add to the context of a remark properly objected to." *Id.* at 122-23.

¶ 61    Our supreme court in *Wheeler* additionally explained:

"Prosecutors are afforded wide latitude in closing argument. [Citation.] In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them. [Citation.] Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction. [Citation.] If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted. [Citation.]" *Id.* at 123.

We also note that this court can consider the cumulative effect of improper argument rather than assess the prejudicial effect of every isolated comment. *People v. Quiver*, 205 Ill. App. 3d 1067, 1072 (1990). Where cumulative errors create "a pervasive pattern of unfair prejudice to the defendant's case," reversal is appropriate even where the evidence of the defendant's guilt is overwhelming. *People v. Blue*, 189 Ill. 2d 99, 139-40 (2000).

¶ 62    We note that two prosecutors represented the State at trial. One prosecutor gave the closing argument and the other prosecutor gave the rebuttal argument. In the closing argument, the prosecutor began with the following comments:

"There are no more perfect words that describe little 5-year-old Evelyn than the very shirt that she wore on July 6th, 2007; the last shirt that she ever wore. Heavenly angel. Evelyn's beautiful 41-pound, 42-inch body filled this shirt, and the last trace of little Evelyn remain the strands of hair that cover this shirt. The defendant did not covet her little angel. Her own mother. Defendant's own words: Evelyn was not deserving.

In this shirt, Evelyn suffered the most brutal and heinous beating at the hands of her own mother. In this shirt, Evelyn Beltran took blow after blow after blow while looking into the face of the one woman who was supposed to protect her. Instead, that woman came at her like a tornado full of rage and red eyes.

Was Evelyn told that she was loved before she died? No. Because as she smashed her head into the ground, that defendant told Evelyn that she wished she were dead. She got her wish, didn't she. At the hands of her mother, that defendant murdered Evelyn Beltran in a brutal beating. No, the defendant does not, and did not deserve to call Evelyn her daughter."

The prosecutor then commented extensively (recorded in 30 pages of transcript) why the jury should find that the defendant had killed the victim and why it should reject the defendant's testimony that it was actually Jimenez who had killed the victim. The prosecutor then concluded her closing argument with the following comments.

"Six to eight weeks of torture for little Evelyn Beltran. It's all been laid out for you, ladies and gentlemen.

The evidence that this defendant did what she did speaks volumes. And that first month and a half when Evelyn wasn't abused by her mom was kind of like the calm before the storm.

This is what little Evelyn looked like. This is Evelyn Beltran, not what her mother did to her; not just pieces of the–what she basically left over like debris from a storm that you don't even recognize. A tornado comes in and rips everything apart, and you don't recognize anything of it. Well, when you look at those pictures of what the defendant did when she started to beat Evelyn, like a tornado that came in and–whirlwind in her life, she left the debris; and the debris was little Evelyn; Evelyn's body. It was all over it. And, really, the only solace in this: Evelyn is now that heavenly angel. She's free. She's free from the hands of her mother. She's free from the anticipation of the abuse which is arguably more horrific than the abuse can be itself. She's free from trying to grapple and wrap her little head around the fact that her mother treated her so differently from her brothers. She's free from having to cover for her mom; to hide for her. She's free from the beatings and the tummy aches. She's a free heavenly angel. And to not hold her responsible would be a grave injustice."

¶ 63    After the prosecutor made her last comment, defense counsel objected and requested a sidebar. The following colloquy then occurred outside the presence of the jury.

"MR. MILLER [Defense Counsel]: I'd like the record to reflect that Ms. O'Hallaren [the prosecutor] is crying.

MS. O'HALLAREN: Oh, give me a break.

THE COURT: We'll let the record reflect that she–emotional voice.

MR. MILLER: And I understand that but when you start giving personal opinions (inaudible). I want to put that on the record."

¶ 64    Following defense counsel's closing argument, the State gave its rebuttal argument. In a lengthy rebuttal (covering 34 pages of transcript), the prosecutor argued that the defendant's testimony that she did not kill Evelyn was not credible. The prosecutor also argued that the defendant should be found guilty of murder instead of involuntary manslaughter. The prosecutor then concluded with the following comments:

"In the early '60s, there was a horrible tragedy in Chicago at a grade school. A fire at a Catholic grade school took the lives of teachers, nuns and children. It was a horrible tragedy. It was an accident or–is unknown. And there was a beautiful documentary–a sad one but a beautiful one–about that tragedy. And the name of that documentary, it was called Angels Too Soon. That's what Evelyn Beltran was; she was an angel too soon. She's gone from us. Because, you see, that every 5-year-old girl is an angel to somebody. And the bitter irony in this case is that poor little girl, she was taken from this world by her mother, the person who was supposed to protect and care for her. She was wearing her angel emblem. Heavenly angel. And that's the last shirt she would wear before she would leave this life. Evelyn's final resting place may be in her native country of Mexico, but her memory cries out for justice in this courtroom, and it cries out for justice because the evidence–the evidence is overwhelming. It's beyond any doubt this defendant should be held accountable for betraying and murdering. The ultimate–ultimate act of violence

-15-

to her own child, a helpless defenseless child. The evidence is very clear. The only–only just verdict in this case based on the evidence is murder, only murder. Nothing else. I ask you do your duty; review the evidence and find her accountable. Find her guilty of murder."

¶ 65 We first consider the defendant's argument that the prosecutors improperly made repeated references to the victim being a heavenly angel. The defendant is correct that the State did not produce any evidence to establish that the victim was now an angel in Heaven. Thus, the State's repeated references to Evelyn being a "heavenly angel" were improper. *Cf. People v. Allen*, 60 Ill. App. 3d 445, 451 (1978) (finding that the prosecutor's conduct of making the sign of the cross and praying while the trial judge instructed the jury was "totally improper"). Nonetheless, we do not believe that the defendant was prejudiced by the prosecutors' comments. The State presented the defendant's videotaped statements in which she acknowledged that she had killed the victim. Her statements were corroborated by Jimenez's testimony that he had witnessed the defendant brutally beat the victim. As the evidence of the defendant's guilt was overwhelming, the prosecutors' comments are not a basis to disturb the jury's verdict, because they did not play a material part in her conviction. See *Wheeler*, 226 Ill. 2d at 123.

¶ 66 We also reject the defendant's argument that she was deprived of a fair trial because (1) the prosecutors showed the jury the shirt the victim was wearing when she died and (2) the prosecutors argued that she was not worthy of being the victim's mother. The prosecutors' actions in this regard were consistent with the evidence presented at trial. The prosecutors could properly refer to the victim's shirt, and the strands of hair thereupon, to describe the brutality of the beating that the defendant inflicted on the victim before she died. The State's argument that the defendant was not worthy of being the victim's mother was a fair inference from the record in light of the evidence that the defendant told the victim that she hated her and wished that she had never been born.

¶ 67 Further, we find without merit the defendant's argument that one of the prosecutors engaged in "utterly unprofessional conduct" by crying during closing arguments. Although it is indeed improper to cry during closing arguments (see *People v. Dukes*, 12 Ill. 2d 334, 341 (1957)), the record does not establish that the prosecutor was in fact crying. Even though defense counsel complained that the prosecutor was crying, the prosecutor did not admit that she was. Moreover, in response to defense counsel's argument, the trial court found not that she was crying but rather that she was using an emotional voice.

¶ 68 The defendant insists that the prosecutor should not have used an "emotional voice," because doing so makes an argument emotion-laden, which is also clearly improper. See *Blue*, 189 Ill. 2d at 126-32. There is no requirement that a prosecutor give an argument without any emotion. Indeed, based on the facts of the case, where a five-year-old child was beaten to death, we believe it would have been practically impossible for any prosecutor to give a closing argument without some element of emotion. That being said, a prosecutor should not give a closing argument in such an emotional tone of voice that it serves to inflame the passions of the jury and prejudice the defendant. See generally *People v. Emerson*, 189 Ill. 2d 436, 509 (2000) (improper for prosecutor to appeal to jurors' emotions in closing argument). However, based on the record before us, we cannot say that the

defendant was prejudiced by the prosecutor's emotional tone of voice. The trial court's comment that the prosecutor was speaking in an "emotional voice" does not tell us if the prosecutor was just speaking in a tone consistent with discussing the murder of a five-year-old child or in a tone that was inflaming the passions of the jury. The trial court was in a superior position to assess the impact of the tone of the prosecutor's voice on the jury. Further, after defense counsel brought the issue to the trial court's attention, the court did not tell the prosecutor to stop using that tone of voice. Thus, we cannot find that the defendant was prejudiced by the prosecutor's tone of voice. See generally *People v. Davis*, 378 Ill. App. 3d 1, 13 (2007) (trial court is in far superior position than reviewing court to assess witness's tone of voice).

¶ 69    We also find unpersuasive the defendant's argument that the State's rebuttal argument "needlessly degraded the defense." The defendant insists that the prosecutor unfairly diminished the integrity of her defense by claiming that (1) the defense "came out of thin air" and (2) defense counsel's point that none of the victim's hair was found on the carpet to corroborate Jimenez's testimony was "CSI imaginary stuff." The State's argument that the defense "came out of thin air" was equivalent to referring to the defendant as a "liar." It is not inappropriate to call the defendant a liar if the record supports that assertion. See *People v. Rivera*, 262 Ill. App. 3d 16, 27 (1994) (explaining that it is not improper to call the defendant a "liar" if conflicts in the evidence make such an assertion a fair inference). Here, the defendant's testimony at trial regarding how the victim died conflicted with the explanation that she gave to the police following the victim's death. Thus, the State's referring to her defense as having come out of thin air was not improper.

¶ 70    The argument regarding the "CSI imaginary stuff" pertains to defense counsel's argument regarding Jimenez's and Dr. John Denton's testimony. Jimenez testified that the defendant had banged the victim's head against the carpeted floor. Dr. Denton, a forensic pathologist, testified that he had performed an autopsy on the victim and did not find any carpet fibers in her hair. In his closing argument, defense counsel suggested that, if Jimenez's description of how and where the defendant beat the victim were true, then Dr. Denton would have found carpet fibers in the victim's hair. In rebuttal, the prosecutor argued that there was no evidence that carpet fibers should be expected to have been found in the victim's hair had her head made contact with the carpet. The prosecutor concluded his point by stating, "That's CSI imaginary stuff."

¶ 71    As the prosecutor pointed out, there was no testimony that, had the beating occurred as Jimenez described, there normally would have been carpet fibers in the victim's hair. As such, the prosecutor's argument was a fair comment on a flaw in the logic of defense counsel's argument and, therefore, was not improper. See *People v. Campbell*, 332 Ill. App. 3d 721, 727 (2002) (prosecutor may respond to comments made by defense counsel and highlight the weaknesses of the defendant's argument).

¶ 72    Finally, we reject the defendant's argument that the pervasive effects of the prosecutors' comments deprived her of a fair trial. Other than the prosecutors' references to the victim as a "heavenly angel," we have not found that any of the comments that the defendant complains of were improper. As explained above, the prosecutors' referring to the victim as a "heavenly angel" did not deprive the defendant of a fair trial. Although those comments

-17-

were improper, they were only a small part, not a pervasive part, of the State's lengthy closing argument and rebuttal.

¶ 73   For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 74   Affirmed.